# BRAGDON *v.* ABBOTT ET AL.

No. 97–156.   Argued March 30, 1998—Decided June 25, 1998

626

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a concurring opinion, in which BREYER, J., joined, *post*, p. 655. GINSBURG, J., filed a concurring opinion, *post*, p. 656. REHNQUIST, C. J., filed an opinion concurring in the judgment in part and dissenting in part, in which SCALIA and THOMAS, JJ., joined, and in Part II of which O'CONNOR, J., joined, *post*, p. 657. O'CONNOR, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 664.

*John W. McCarthy* argued the cause for petitioner. With him on the briefs was *Brent A. Singer*.

*Bennett H. Klein* argued the cause for respondents. With him on the brief for respondent Abbott was *Wendy E. Parmet*. *John E. Carnes* filed a brief for respondent Maine Human Rights Commission.

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Waxman, Act-*

*ing Assistant Attorney General Lee, James A. Feldman, Jessica Dunsay Silver,* and *Thomas E. Chandler.*[*]

JUSTICE KENNEDY delivered the opinion of the Court.

We address in this case the application of the Americans with Disabilities Act of 1990 (ADA), 104 Stat. 327, 42 U. S. C. § 12101 *et seq.*, to persons infected with the human immunodeficiency virus (HIV). We granted certiorari to review, first, whether HIV infection is a disability under the ADA when the infection has not yet progressed to the so-called symptomatic phase; and, second, whether the Court of Appeals, in affirming a grant of summary judgment, cited sufficient material in the record to determine, as a matter of law, that respondent's infection with HIV posed no direct threat to the health and safety of her treating dentist. 522 U. S. 991 (1997).

I

Respondent Sidney Abbott (hereinafter respondent) has been infected with HIV since 1986. When the incidents we recite occurred, her infection had not manifested its most serious symptoms. On September 16, 1994, she went to the office of petitioner Randon Bragdon in Bangor, Maine, for a dental appointment. She disclosed her HIV infection on the

---

[*]*Ann Elizabeth Reesman* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the City of Los Angeles by *James K. Hahn* and *David I. Schulman;* for the AIDS Action Council et al. by *Chai R. Feldblum, Steven R. Shapiro, Matthew Coles,* and *Robert A. Long, Jr.;* for the American Medical Association by *Carter G. Phillips, Mark E. Haddad, Jack R. Bierig, Michael L. Ile,* and *Leonard A. Nelson;* for the Elizabeth Glaser Pediatric AIDS Foundation by *Lynn E. Cunningham;* for the Infectious Diseases Society of America et al. by *Catherine A. Hanssens, Heather C. Sawyer, Beatrice Dohrn, Daniel Bruner, Elizabeth A. Seaton,* and *Laura M. Flegel;* and for Senator Harkin et al. by *Arlene Mayerson.*

*Peter M. Sfikas* filed a brief for the American Dental Association as *amicus curiae.*

patient registration form. Petitioner completed a dental examination, discovered a cavity, and informed respondent of his policy against filling cavities of HIV-infected patients. He offered to perform the work at a hospital with no added fee for his services, though respondent would be responsible for the cost of using the hospital's facilities. Respondent declined.

Respondent sued petitioner under state law and § 302 of the ADA, 104 Stat. 355, 42 U. S. C. § 12182, alleging discrimination on the basis of her disability. The state-law claims are not before us. Section 302 of the ADA provides:

"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who . . . operates a place of public accommodation." § 12182(a).

The term "public accommodation" is defined to include the "professional office of a health care provider." § 12181(7)(F).

A later subsection qualifies the mandate not to discriminate. It provides:

"Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others." § 12182(b)(3).

The United States and the Maine Human Rights Commission intervened as plaintiffs. After discovery, the parties filed cross-motions for summary judgment. The District Court ruled in favor of the plaintiffs, holding that respondent's HIV infection satisfied the ADA's definition of disability. 912 F. Supp. 580, 585–587 (Me. 1995). The court held further that petitioner raised no genuine issue of material fact as to whether respondent's HIV infection would have

posed a direct threat to the health or safety of others during the course of a dental treatment. *Id.*, at 587–591. The court relied on affidavits submitted by Dr. Donald Wayne Marianos, Director of the Division of Oral Health of the Centers for Disease Control and Prevention (CDC). The Marianos affidavits asserted it is safe for dentists to treat patients infected with HIV in dental offices if the dentist follows the so-called universal precautions described in the Recommended Infection-Control Practices for Dentistry issued by CDC in 1993 (1993 CDC Dentistry Guidelines). 912 F. Supp., at 589.

The Court of Appeals affirmed. It held respondent's HIV infection was a disability under the ADA, even though her infection had not yet progressed to the symptomatic stage. 107 F. 3d 934, 939–943 (CA1 1997). The Court of Appeals also agreed that treating the respondent in petitioner's office would not have posed a direct threat to the health and safety of others. *Id.*, at 943–948. Unlike the District Court, however, the Court of Appeals declined to rely on the Marianos affidavits. *Id.*, at 946, n. 7. Instead the court relied on the 1993 CDC Dentistry Guidelines, as well as the Policy on AIDS, HIV Infection and the Practice of Dentistry, promulgated by the American Dental Association in 1991 (1991 American Dental Association Policy on HIV). 107 F. 3d, at 945–946.

## II

We first review the ruling that respondent's HIV infection constituted a disability under the ADA. The statute defines disability as:

> "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> "(B) a record of such an impairment; or
> "(C) being regarded as having such an impairment." § 12102(2).

We hold respondent's HIV infection was a disability under subsection (A) of the definitional section of the statute. In light of this conclusion, we need not consider the applicability of subsections (B) or (C).

Our consideration of subsection (A) of the definition proceeds in three steps. First, we consider whether respondent's HIV infection was a physical impairment. Second, we identify the life activity upon which respondent relies (reproduction and childbearing) and determine whether it constitutes a major life activity under the ADA. Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity. In construing the statute, we are informed by interpretations of parallel definitions in previous statutes and the views of various administrative agencies which have faced this interpretive question.

A

The ADA's definition of disability is drawn almost verbatim from the definition of "handicapped individual" included in the Rehabilitation Act of 1973, 87 Stat. 361, as amended, 29 U. S. C. § 706(8)(B) (1988 ed.), and the definition of "handicap" contained in the Fair Housing Amendments Act of 1988, 102 Stat. 1619, 42 U. S. C. § 3602(h)(1) (1988 ed.). Congress' repetition of a well-established term carries the implication that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations. See *FDIC* v. *Philadelphia Gear Corp.*, 476 U. S. 426, 437–438 (1986); *Commissioner* v. *Estate of Noel*, 380 U. S. 678, 681–682 (1965); *ICC* v. *Parker*, 326 U. S. 60, 65 (1945). In this case, Congress did more than suggest this construction; it adopted a specific statutory provision in the ADA directing as follows:

> "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the

Rehabilitation Act of 1973 (29 U. S. C. 790 et seq.) or the regulations issued by Federal agencies pursuant to such title." 42 U. S. C. § 12201(a).

The directive requires us to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act.

1

The first step in the inquiry under subsection (A) requires us to determine whether respondent's condition constituted a physical impairment. The Department of Health, Education and Welfare (HEW) issued the first regulations interpreting the Rehabilitation Act in 1977. The regulations are of particular significance because, at the time, HEW was the agency responsible for coordinating the implementation and enforcement of § 504 of that statute. *Consolidated Rail Corporation* v. *Darrone*, 465 U. S. 624, 634 (1984) (citing Exec. Order No. 11914, 3 CFR 117 (1976–1980 Comp.)). Section 504 prohibits discrimination against individuals with disabilities by recipients of federal financial assistance. 29 U. S. C. § 794. The HEW regulations, which appear without change in the current regulations issued by the Department of Health and Human Services, define "physical or mental impairment" to mean:

> "(A) any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or
>
> "(B) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 45 CFR § 84.3(j)(2)(i) (1997).

In issuing these regulations, HEW decided against including a list of disorders constituting physical or mental impairments, out of concern that any specific enumeration might not be comprehensive. 42 Fed. Reg. 22685 (1977), reprinted in 45 CFR pt. 84, App. A, p. 334 (1997). The commentary accompanying the regulations, however, contains a representative list of disorders and conditions constituting physical impairments, including "such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, and . . . drug addiction and alcoholism." *Ibid.*

In 1980, the President transferred responsibility for the implementation and enforcement of §504 to the Attorney General. See, *e. g.*, Exec. Order No. 12250, 3 CFR 298 (1981). The regulations issued by the Justice Department, which remain in force to this day, adopted verbatim the HEW definition of physical impairment quoted above. 28 CFR §41.31(b)(1) (1997). In addition, the representative list of diseases and conditions originally relegated to the commentary accompanying the HEW regulations were incorporated into the text of the regulations. *Ibid.*

HIV infection is not included in the list of specific disorders constituting physical impairments, in part because HIV was not identified as the cause of AIDS until 1983. See Barré-Sinoussi et al., Isolation of a T-Lymphotropic Retrovirus from a Patient at Risk for Acquired Immune Deficiency Syndrome (AIDS), 220 Science 868 (1983); Gallo et al., Frequent Detection and Isolation of Cytopathic Retroviruses (HTLV–III) from Patients with AIDS and at Risk for AIDS, 224 Science 500 (1984); Levy et al., Isolation of Lymphocytopathic Retroviruses from San Francisco Patients with AIDS, 225 Science 840 (1984). HIV infection does fall well within the general definition set forth by the regulations, however.

The disease follows a predictable and, as of today, an unalterable course. Once a person is infected with HIV, the

virus invades different cells in the blood and in body tissues. Certain white blood cells, known as helper T-lymphocytes or CD4+ cells, are particularly vulnerable to HIV. The virus attaches to the CD4 receptor site of the target cell and fuses its membrane to the cell's membrane. HIV is a retrovirus, which means it uses an enzyme to convert its own genetic material into a form indistinguishable from the genetic material of the target cell. The virus' genetic material migrates to the cell's nucleus and becomes integrated with the cell's chromosomes. Once integrated, the virus can use the cell's own genetic machinery to replicate itself. Additional copies of the virus are released into the body and infect other cells in turn. Young, The Replication Cycle of HIV–1, in The AIDS Knowledge Base, pp. 3.1–2 to 3.1–7 (P. Cohen, M. Sande, & P. Volberding eds., 2d ed. 1994) (hereinafter AIDS Knowledge Base); Folks & Hart, The Life Cycle of Human Immunodeficiency Virus Type 1, in AIDS: Etiology, Diagnosis, Treatment and Prevention 29–39 (V. DeVita et al. eds., 4th ed. 1997) (hereinafter AIDS: Etiology); Greene, Molecular Insights into HIV–1 Infection, in The Medical Management of AIDS 18–24 (M. Sande & P. Volberding eds., 5th ed. 1997) (hereinafter Medical Management of AIDS). Although the body does produce antibodies to combat HIV infection, the antibodies are not effective in eliminating the virus. Pantaleo et al., Immunopathogenesis of Human Immunodeficiency Virus Infection, in AIDS: Etiology 79; Gardner, HIV Vaccine Development, in AIDS Knowledge Base 3.6–5; Haynes, Immune Responses to Human Immunodeficiency Virus Infection, in AIDS: Etiology 91.

The virus eventually kills the infected host cell. CD4+ cells play a critical role in coordinating the body's immune response system, and the decline in their number causes corresponding deterioration of the body's ability to fight infections from many sources. Tracking the infected individual's CD4+ cell count is one of the most accurate measures of the course of the disease. Greene, Medical Management of

AIDS 19, 24. Osmond, Classification and Staging of HIV Disease, in AIDS Knowledge Base 1.1–8; Saag, Clinical Spectrum of Human Immunodeficiency Virus Diseases, in AIDS: Etiology 204.

The initial stage of HIV infection is known as acute or primary HIV infection. In a typical case, this stage lasts three months. The virus concentrates in the blood. The assault on the immune system is immediate. The victim suffers from a sudden and serious decline in the number of white blood cells. There is no latency period. Mononucleosis-like symptoms often emerge between six days and six weeks after infection, at times accompanied by fever, headache, enlargement of the lymph nodes (lymphadenopathy), muscle pain (myalgia), rash, lethargy, gastrointestinal disorders, and neurological disorders. Usually these symptoms abate within 14 to 21 days. HIV antibodies appear in the bloodstream within 3 weeks; circulating HIV can be detected within 10 weeks. Carr & Cooper, Primary HIV Infection, in Medical Management of AIDS 89–91; Cohen & Volberding, Clinical Spectrum of HIV Disease, in AIDS Knowledge Base 4.1–7; Crowe & McGrath, Acute HIV Infection, in AIDS Knowledge Base 4.2–1 to 4.2–4; Saag, AIDS: Etiology 204–205.

After the symptoms associated with the initial stage subside, the disease enters what is referred to sometimes as its asymptomatic phase. The term is a misnomer, in some respects, for clinical features persist throughout, including lymphadenopathy, dermatological disorders, oral lesions, and bacterial infections. Although it varies with each individual, in most instances this stage lasts from 7 to 11 years. The virus now tends to concentrate in the lymph nodes, though low levels of the virus continue to appear in the blood. Cohen & Volberding, AIDS Knowledge Base 4.1–4, 4.1–8; Saag, AIDS: Etiology 205–206; Staprans & Feinberg, Natural History and Immunopathogenesis of HIV–1 Disease, in Medical Management of AIDS 29, 38. It was once

thought the virus became inactive during this period, but it is now known that the relative lack of symptoms is attributable to the virus' migration from the circulatory system into the lymph nodes. Cohen & Volberding, AIDS Knowledge Base 4.1–4. The migration reduces the viral presence in other parts of the body, with a corresponding diminution in physical manifestations of the disease. The virus, however, thrives in the lymph nodes, which, as a vital point of the body's immune response system, represents an ideal environment for the infection of other CD4+ cells. Staprans & Feinberg, Medical Management of AIDS 33–34. Studies have shown that viral production continues at a high rate. Cohen & Volberding, AIDS Knowledge Base 4.1–4; Staprans & Feinberg, Medical Management of AIDS 38. CD4+ cells continue to decline an average of 5% to 10% (40 to 80 cells/mm3) per year throughout this phase. Saag, AIDS: Etiology 207.

A person is regarded as having AIDS when his or her CD4+ count drops below 200 cells/mm3 of blood or when CD4+ cells comprise less than 14% of his or her total lymphocytes. U. S. Dept. of Health and Human Services, Public Health Service, CDC, 1993 Revised Classification System for HIV Infection and Expanded Surveillance Case Definition for AIDS Among Adolescents and Adults, 41 Morbidity and Mortality Weekly Rep., No. RR–17 (Dec. 18, 1992); Osmond, AIDS Knowledge Base 1.1–2; Saag, AIDS: Etiology 207; Ward, Petersen, & Jaffe, Current Trends in the Epidemiology of HIV/AIDS, in Medical Management of AIDS 3. During this stage, the clinical conditions most often associated with HIV, such as *pneumocystis carninii* pneumonia, Kaposi's sarcoma, and non-Hodgkins lymphoma, tend to appear. In addition, the general systemic disorders present during all stages of the disease, such as fever, weight loss, fatigue, lesions, nausea, and diarrhea, tend to worsen. In most cases, once the patient's CD4+ count drops below 10

cells/mm3, death soon follows. Cohen & Volberding, AIDS Knowledge Base 4.1–9; Saag, AIDS: Etiology 207–209.

In light of the immediacy with which the virus begins to damage the infected person's white blood cells and the severity of the disease, we hold it is an impairment from the moment of infection. As noted earlier, infection with HIV causes immediate abnormalities in a person's blood, and the infected person's white cell count continues to drop throughout the course of the disease, even when the attack is concentrated in the lymph nodes. In light of these facts, HIV infection must be regarded as a physiological disorder with a constant and detrimental effect on the infected person's hemic and lymphatic systems from the moment of infection. HIV infection satisfies the statutory and regulatory definition of a physical impairment during every stage of the disease.

2

The statute is not operative, and the definition not satisfied, unless the impairment affects a major life activity. Respondent's claim throughout this case has been that the HIV infection placed a substantial limitation on her ability to reproduce and to bear children. App. 14; 912 F. Supp., at 586; 107 F. 3d, at 939. Given the pervasive, and invariably fatal, course of the disease, its effect on major life activities of many sorts might have been relevant to our inquiry. Respondent and a number of *amici* make arguments about HIV's profound impact on almost every phase of the infected person's life. See Brief for Respondent Abbott 24–27; Brief for American Medical Association as *Amicus Curiae* 20; Brief for Infectious Diseases Society of America et al. as *Amici Curiae* 7–11. In light of these submissions, it may seem legalistic to circumscribe our discussion to the activity of reproduction. We have little doubt that had different parties brought the suit they would have maintained that an HIV infection imposes substantial limitations on other major life activities.

From the outset, however, the case has been treated as one in which reproduction was the major life activity limited by the impairment. It is our practice to decide cases on the grounds raised and considered in the Court of Appeals and included in the question on which we granted certiorari. See, *e. g., Blessing* v. *Freestone,* 520 U. S. 329, 340, n. 3 (1997) (citing this Court's Rule 14.1(a)); *Capitol Square Review and Advisory Bd.* v. *Pinette,* 515 U. S. 753, 760 (1995). We ask, then, whether reproduction is a major life activity.

We have little difficulty concluding that it is. As the Court of Appeals held, "[t]he plain meaning of the word 'major' denotes comparative importance" and "suggest[s] that the touchstone for determining an activity's inclusion under the statutory rubric is its significance." 107 F. 3d, at 939, 940. Reproduction falls well within the phrase "major life activity." Reproduction and the sexual dynamics surrounding it are central to the life process itself.

While petitioner concedes the importance of reproduction, he claims that Congress intended the ADA only to cover those aspects of a person's life which have a public, economic, or daily character. Brief for Petitioner 14, 28, 30, 31; see also *id.,* at 36–37 (citing *Krauel* v. *Iowa Methodist Medical Center,* 95 F. 3d 674, 677 (CA8 1996)). The argument founders on the statutory language. Nothing in the definition suggests that activities without a public, economic, or daily dimension may somehow be regarded as so unimportant or insignificant as to fall outside the meaning of the word "major." The breadth of the term confounds the attempt to limit its construction in this manner.

As we have noted, the ADA must be construed to be consistent with regulations issued to implement the Rehabilitation Act. See 42 U. S. C. § 12201(a). Rather than enunciating a general principle for determining what is and is not a major life activity, the Rehabilitation Act regulations instead provide a representative list, defining the term to include "functions such as caring for one's self, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 CFR § 84.3(j)(2)(ii) (1997); 28 CFR § 41.31(b)(2) (1997). As the use of the term "such as" confirms, the list is illustrative, not exhaustive.

These regulations are contrary to petitioner's attempt to limit the meaning of the term "major" to public activities. The inclusion of activities such as caring for one's self and performing manual tasks belies the suggestion that a task must have a public or economic character in order to be a major life activity for purposes of the ADA. On the contrary, the Rehabilitation Act regulations support the inclusion of reproduction as a major life activity, since reproduction could not be regarded as any less important than working and learning. Petitioner advances no credible basis for confining major life activities to those with a public, economic, or daily aspect. In the absence of any reason to reach a contrary conclusion, we agree with the Court of Appeals' determination that reproduction is a major life activity for the purposes of the ADA.

3

The final element of the disability definition in subsection (A) is whether respondent's physical impairment was a substantial limit on the major life activity she asserts. The Rehabilitation Act regulations provide no additional guidance. 45 CFR pt. 84, App. A, p. 334 (1997).

Our evaluation of the medical evidence leads us to conclude that respondent's infection substantially limited her ability to reproduce in two independent ways. First, a woman infected with HIV who tries to conceive a child imposes on the man a significant risk of becoming infected. The cumulative results of 13 studies collected in a 1994 textbook on AIDS indicates that 20% of male partners of women with HIV became HIV-positive themselves, with a majority of the studies finding a statistically significant risk of infection. Osmond & Padian, Sexual Transmission of HIV, in AIDS

Knowledge Base 1.9–8, and tbl. 2; see also Haverkos & Battjes, Female-to-Male Transmission of HIV, 268 JAMA 1855, 1856, tbl. (1992) (cumulative results of 16 studies indicated 25% risk of female-to-male transmission). (Studies report a similar, if not more severe, risk of male-to-female transmission. See, e. g., Osmond & Padian, AIDS Knowledge Base 1.9–3, tbl. 1, 1.9–6 to 1.9–7.)

Second, an infected woman risks infecting her child during gestation and childbirth, i. e., perinatal transmission. Petitioner concedes that women infected with HIV face about a 25% risk of transmitting the virus to their children. 107 F. 3d, at 942; 912 F. Supp., at 587, n. 6. Published reports available in 1994 confirm the accuracy of this statistic. Report of a Consensus Workshop, Maternal Factors Involved in Mother-to-Child Transmission of HIV–1, 5 J. Acquired Immune Deficiency Syndromes 1019, 1020 (1992) (collecting 13 studies placing risk between 14% and 40%, with most studies falling within the 25% to 30% range); Connor et al., Reduction of Maternal-Infant Transmission of Human Immunodeficiency Virus Type 1 with Zidovudine Treatment, 331 New England J. Med. 1173, 1176 (1994) (placing risk at 25.5%); see also Staprans & Feinberg, Medical Management of AIDS 32 (studies report 13% to 45% risk of infection, with average of approximately 25%).

Petitioner points to evidence in the record suggesting that antiretroviral therapy can lower the risk of perinatal transmission to about 8%. App. 53; see also Connor, supra, at 1176 (8.3%); Sperling et al., Maternal Viral Load, Zidovudine Treatment, and the Risk of Transmission of Human Immunodeficiency Virus Type 1 from Mother to Infant, 335 New England J. Med. 1621, 1622 (1996) (7.6%). The United States questions the relevance of the 8% figure, pointing to regulatory language requiring the substantiality of a limitation to be assessed without regard to available mitigating measures. Brief for United States as Amicus Curiae 18, n. 10 (citing 28 CFR pt. 36, App. B, p. 611 (1997); 29 CFR pt.

1630, App., p. 351 (1997)). We need not resolve this dispute in order to decide this case, however. It cannot be said as a matter of law that an 8% risk of transmitting a dread and fatal disease to one's child does not represent a substantial limitation on reproduction.

The Act addresses substantial limitations on major life activities, not utter inabilities. Conception and childbirth are not impossible for an HIV victim but, without doubt, are dangerous to the public health. This meets the definition of a substantial limitation. The decision to reproduce carries economic and legal consequences as well. There are added costs for antiretroviral therapy, supplemental insurance, and long-term health care for the child who must be examined and, tragic to think, treated for the infection. The laws of some States, moreover, forbid persons infected with HIV to have sex with others, regardless of consent. Iowa Code §§ 139.1, 139.31 (1997); Md. Health Code Ann. § 18–601.1(a) (1994); Mont. Code Ann. §§ 50–18–101, 50–18–112 (1997); Utah Code Ann. § 26–6–3.5(3) (Supp. 1997); id., § 26–6–5 (1995); Wash. Rev. Code § 9A.36.011(1)(b) (Supp. 1998); see also N. D. Cent. Code § 12.1–20–17 (1997).

In the end, the disability definition does not turn on personal choice. When significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable. For the statistical and other reasons we have cited, of course, the limitations on reproduction may be insurmountable here. Testimony from the respondent that her HIV infection controlled her decision not to have a child is unchallenged. App. 14; 912 F. Supp., at 587; 107 F. 3d, at 942. In the context of reviewing summary judgment, we must take it to be true. Fed. Rule Civ. Proc. 56(e). We agree with the District Court and the Court of Appeals that no triable issue of fact impedes a ruling on the question of statutory coverage. Respondent's HIV infection is a physical impairment which substantially limits a major life activity, as the ADA defines it. In view of our holding, we

need not address the second question presented, *i. e.*, whether HIV infection is a *per se* disability under the ADA.

## B

Our holding is confirmed by a consistent course of agency interpretation before and after enactment of the ADA. Every agency to consider the issue under the Rehabilitation Act found statutory coverage for persons with asymptomatic HIV. Responsibility for administering the Rehabilitation Act was not delegated to a single agency, but we need not pause to inquire whether this causes us to withhold deference to agency interpretations under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844 (1984). It is enough to observe that the well-reasoned views of the agencies implementing a statute "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 139–140 (1944).

One comprehensive and significant administrative precedent is a 1988 opinion issued by the Office of Legal Counsel of the Department of Justice (OLC) concluding that the Rehabilitation Act "protects symptomatic and asymptomatic HIV-infected individuals against discrimination in any covered program." Application of Section 504 of the Rehabilitation Act to HIV-Infected Individuals, 12 Op. Off. Legal Counsel 264, 264–265 (Sept. 27, 1988) (preliminary print) (footnote omitted). Relying on a letter from Surgeon General C. Everett Koop stating that, "from a purely scientific perspective, persons with HIV are clearly impaired" even during the asymptomatic phase, OLC determined asymptomatic HIV was a physical impairment under the Rehabilitation Act because it constituted a "physiological disorder or condition affecting the hemic and lymphatic systems." *Id.*, at 271 (internal quotation marks omitted). OLC determined further that asymptomatic HIV imposed a substantial limit on the major life activity of reproduction. The opinion said:

"Based on the medical knowledge available to us, we believe that it is reasonable to conclude that the life activity of procreation . . . is substantially limited for an asymptomatic HIV-infected individual. In light of the significant risk that the AIDS virus may be transmitted to a baby during pregnancy, HIV-infected individuals cannot, whether they are male or female, engage in the act of procreation with the normal expectation of bringing forth a healthy child." *Id.*, at 273.

In addition, OLC indicated that "[t]he life activity of engaging in sexual relations is threatened and probably substantially limited by the contagiousness of the virus." *Id.*, at 274. Either consideration was sufficient to render asymptomatic HIV infection a handicap for purposes of the Rehabilitation Act. In the course of its opinion, OLC considered, and rejected, the contention that the limitation could be discounted as a voluntary response to the infection. The limitation, it reasoned, was the infection's manifest physical effect. *Id.*, at 274, and n. 13. Without exception, the other agencies to address the problem before enactment of the ADA reached the same result. Federal Contract Compliance Manual App. 6D, 8 FEP Manual 405:352 (Dec. 23, 1988); *In re Ritter,* No. 03890089, 1989 WL 609697, *10 (EEOC, Dec. 8, 1989); see also Comptroller General's Task Force on AIDS in the Workplace, Coping with AIDS in the GAO Workplace: Task Force Report 29 (Dec. 1987); Report of the Presidential Commission on the Human Immunodeficiency Virus Epidemic 113–114, 122–123 (June 1988). Agencies have adhered to this conclusion since the enactment of the ADA as well. See 5 CFR § 1636.103 (1997); 7 CFR § 15e.103 (1998); 22 CFR § 1701.103 (1997); 24 CFR § 9.103 (1997); 34 CFR § 1200.103 (1997); 45 CFR §§ 2301.103, 2490.103 (1997); *In re Westchester County Medical Center,* [1991–1994 Transfer Binder] CCH Employment Practices Guide ¶ 5340, pp. 6110–6112 (Apr. 20, 1992), aff'd, *id.,* ¶ 5362, pp. 6249–6250 (Dept. of Health & Human Servs. Departmental Appeals Bd., Sept. 25, 1992);

*In re Rosebud Sioux Tribe,* No. 93–504–1, 1994 WL 603015 (Dept. of Health & Human Servs. Departmental Appeals Bd., July 14, 1994); *In re Martin,* No. 01954089, 1997 WL 151524, *4 (EEOC, Mar. 27, 1997).

Every court which addressed the issue before the ADA was enacted in July 1990, moreover, concluded that asymptomatic HIV infection satisfied the Rehabilitation Act's definition of a handicap. See *Doe* v. *Garrett,* 903 F. 2d 1455, 1457 (CA11 1990), cert. denied, 499 U. S. 904 (1991); *Ray* v. *School Dist. of DeSoto County,* 666 F. Supp. 1524, 1536 (MD Fla. 1987); *Thomas* v. *Atascadero Unified School Dist.,* 662 F. Supp. 376, 381 (CD Cal. 1987); *District 27 Community School Bd.* v. *Board of Ed. of New York,* 130 Misc. 2d 398, 413–415, 502 N. Y. S. 2d 325, 335–337 (Sup. Ct., Queens Cty. 1986); cf. *Baxter* v. *Belleville,* 720 F. Supp. 720, 729 (SD Ill. 1989) (Fair Housing Amendments Act); *Cain* v. *Hyatt,* 734 F. Supp. 671, 679 (ED Pa. 1990) (Pennsylvania Human Relations Act). (For cases finding infection with HIV to be a handicap without distinguishing between symptomatic and asymptomatic HIV, see *Martinez ex rel. Martinez* v. *School Bd. of Hillsborough Cty.,* 861 F. 2d 1502, 1506 (CA11 1988); *Chalk* v. *United States Dist. Ct.,* 840 F. 2d 701, 706 (CA9 1988); *Doe* v. *Dolton Elementary School Dist. No. 148,* 694 F. Supp. 440, 444–445 (ND Ill. 1988); *Robertson* v. *Granite City Community Unit School Dist. No. 9,* 684 F. Supp. 1002, 1006–1007 (SD Ill. 1988); *Local 1812, AFGE* v. *United States Dept. of State,* 662 F. Supp. 50, 54 (DC 1987); cf. *Association of Relatives and Friends of AIDS Patients* v. *Regulations and Permits Admin.,* 740 F. Supp. 95, 103 (PR 1990) (Fair Housing Amendments Act).) We are aware of no instance prior to the enactment of the ADA in which a court or agency ruled that HIV infection was not a handicap under the Rehabilitation Act.

Had Congress done nothing more than copy the Rehabilitation Act definition into the ADA, its action would indicate

the new statute should be construed in light of this unwavering line of administrative and judicial interpretation. All indications are that Congress was well aware of the position taken by OLC when enacting the ADA and intended to give that position its active endorsement. H. R. Rep. No. 101–485, pt. 2, p. 52 (1990) (endorsing the analysis and conclusion of the OLC opinion); *id.*, pt. 3, at 28, n. 18 (same); S. Rep. No. 101–116, pp. 21, 22 (1989) (same). As noted earlier, Congress also incorporated the same definition into the Fair Housing Amendments Act of 1988. See 42 U. S. C. §3602(h)(1). We find it significant that the implementing regulations issued by the Department of Housing and Urban Development (HUD) construed the definition to include infection with HIV. 54 Fed. Reg. 3232, 3245 (1989) (codified at 24 CFR §100.201 (1997)); see also *In re Williams*, 2A P–H Fair Housing-Fair Lending ¶25,007, pp. 25,111–25,113 (HUD Off. Admin. Law Judges, Mar. 22, 1991) (adhering to this interpretation); *In re Elroy R. and Dorothy Burns Trust*, 2A P–H Fair Housing-Fair Lending ¶25,073, p. 25,678 (HUD Off. Admin. Law Judges, June 17, 1994) (same). Again the legislative record indicates that Congress intended to ratify HUD's interpretation when it reiterated the same definition in the ADA. H. R. Rep. No. 101–485, pt. 2, at 50; *id.*, pt. 3, at 27; *id.*, pt. 4, at 36; S. Rep. No. 101–116, at 21.

We find the uniformity of the administrative and judicial precedent construing the definition significant. When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well. See, *e. g., Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978). The uniform body of administrative and judicial precedent confirms the conclusion we reach today as the most faithful way to effect the congressional design.

## C

Our conclusion is further reinforced by the administrative guidance issued by the Justice Department to implement the public accommodation provisions of Title III of the ADA. As the agency directed by Congress to issue implementing regulations, see 42 U. S. C. § 12186(b), to render technical assistance explaining the responsibilities of covered individuals and institutions, § 12206(c), and to enforce Title III in court, § 12188(b), the Department's views are entitled to deference. See *Chevron*, 467 U. S., at 844.

The Justice Department's interpretation of the definition of disability is consistent with our analysis. The regulations acknowledge that Congress intended the ADA's definition of disability to be given the same construction as the definition of handicap in the Rehabilitation Act. 28 CFR § 36.103(a) (1997); *id.*, pt. 36, App. B, pp. 608, 609. The regulatory definition developed by HEW to implement the Rehabilitation Act is incorporated verbatim in the ADA regulations. § 36.104. The Justice Department went further, however. It added "HIV infection (symptomatic and asymptomatic)" to the list of disorders constituting a physical impairment. § 36.104(1)(iii). The technical assistance the Department has issued pursuant to 42 U. S. C. § 12206 similarly concludes that persons with asymptomatic HIV infection fall within the ADA's definition of disability. See, *e. g.*, U. S. Dept. of Justice, Civil Rights Division, The Americans with Disabilities Act: Title III Technical Assistance Manual 9 (Nov. 1993); Response to Congressman Sonny Callahan, 5 Nat. Disability L. Rep. (LRP) ¶ 360, p. 1167 (Feb. 9, 1994); Response to A. Laurence Field, 5 Nat. Disability L. Rep. (LRP) ¶ 21, p. 80 (Sept. 10, 1993). Any other conclusion, the Department reasoned, would contradict Congress' affirmative ratification of the administrative interpretations given previous versions of the same definition. 28 CFR pt. 36, App. B, pp. 609, 610 (1997) (citing the OLC opinion and HUD regulations); 56 Fed. Reg. 7455, 7456 (1991) (same) (notice of proposed rulemaking).

We also draw guidance from the views of the agencies authorized to administer other sections of the ADA. See 42 U. S. C. §12116 (authorizing EEOC to issue regulations implementing Title I); §12134(a) (authorizing the Attorney General to issue regulations implementing the public services provisions of Title II, subtitle A); §§12149, 12164, 12186 (authorizing the Secretary of Transportation to issue regulations implementing the transportation-related provisions of Titles II and III); §12206(c) (authorizing the same agencies to offer technical assistance for the provisions they administer). These agencies, too, concluded that HIV infection is a physical impairment under the ADA. 28 CFR §35.104(1)(iii) (1997); 49 CFR §§37.3, 38.3 (1997); 56 Fed. Reg. 13858 (1991); U. S. Dept. of Justice, Civil Rights Division, The Americans with Disabilities Act: Title II Technical Assistance Manual 4 (Nov. 1993); EEOC, A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act II–3 (Jan. 1992) (hereinafter EEOC Technical Assistance Manual); EEOC Interpretive Manual §902.2(d), pp. 902–13 to 902–14 (reissued Mar. 14, 1995) (hereinafter EEOC Interpretive Manual), reprinted in 2 BNA EEOC Compliance Manual 902:0013 (1998). Most categorical of all is EEOC's conclusion that "an individual who has HIV infection (including asymptomatic HIV infection) is an individual with a disability." EEOC Interpretive Manual §902.4(c)(1), p. 902–21; accord, id., §902.2(d), p. 902–14, n. 18. In the EEOC's view, "impairments . . . such as HIV infection, are inherently substantially limiting." 29 CFR pt. 1630, App., p. 350 (1997); EEOC Technical Assistance Manual II–4; EEOC Interpretive Manual §902.4(c)(1), p. 902–21.

The regulatory authorities we cite are consistent with our holding that HIV infection, even in the so-called asymptomatic phase, is an impairment which substantially limits the major life activity of reproduction.

## III

The petition for certiorari presented three other questions for review. The questions stated:

> "3. When deciding under title III of the ADA whether a private health care provider must perform invasive procedures on an infectious patient in his office, should courts defer to the health care provider's professional judgment, as long as it is reasonable in light of then-current medical knowledge?

> "4. What is the proper standard of judicial review under title III of the ADA of a private health care provider's judgment that the performance of certain invasive procedures in his office would pose a direct threat to the health or safety of others?

> "5. Did petitioner, Randon Bragdon, D. M. D., raise a genuine issue of fact for trial as to whether he was warranted in his judgment that the performance of certain invasive procedures on a patient in his office would have posed a direct threat to the health or safety of others?" Pet. for Cert. i.

Of these, we granted certiorari only on question three. The question is phrased in an awkward way, for it conflates two separate inquiries. In asking whether it is appropriate to defer to petitioner's judgment, it assumes that petitioner's assessment of the objective facts was reasonable. The central premise of the question and the assumption on which it is based merit separate consideration.

Again, we begin with the statute. Notwithstanding the protection given respondent by the ADA's definition of disability, petitioner could have refused to treat her if her infectious condition "pose[d] a direct threat to the health or safety of others." 42 U. S. C. § 12182(b)(3). The ADA defines a direct threat to be "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids

or services." *Ibid.* Parallel provisions appear in the employment provisions of Title I. §§ 12111(3), 12113(b).

The ADA's direct threat provision stems from the recognition in *School Bd. of Nassau Cty.* v. *Arline,* 480 U. S. 273, 287 (1987), of the importance of prohibiting discrimination against individuals with disabilities while protecting others from significant health and safety risks, resulting, for instance, from a contagious disease. In *Arline,* the Court reconciled these objectives by construing the Rehabilitation Act not to require the hiring of a person who posed "a significant risk of communicating an infectious disease to others." *Id.,* at 287, n. 16. Congress amended the Rehabilitation Act and the Fair Housing Act to incorporate the language. See 29 U. S. C. § 706(8)(D) (excluding individuals who "would constitute a direct threat to the health or safety of other individuals"); 42 U. S. C. § 3604(f)(9) (same). It later relied on the same language in enacting the ADA. See 28 CFR pt. 36, App. B, p. 626 (1997) (ADA's direct threat provision codifies *Arline*). Because few, if any, activities in life are risk free, *Arline* and the ADA do not ask whether a risk exists, but whether it is significant. *Arline, supra,* at 287, and n. 16; 42 U. S. C. § 12182(b)(3).

The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation, and the risk assessment must be based on medical or other objective evidence. *Arline, supra,* at 288; 28 CFR § 36.208(c) (1997); *id.,* pt. 36, App. B, p. 626. As a health care professional, petitioner had the duty to assess the risk of infection based on the objective, scientific information available to him and others in his profession. His belief that a significant risk existed, even if maintained in good faith, would not relieve him from liability. To use the words of the question presented, petitioner receives no special deference simply because he is a health care professional. It is true that *Arline* reserved "the question whether courts should also defer to the reasonable medical

judgments of private physicians on which an employer has relied." 480 U. S., at 288, n. 18. At most, this statement reserved the possibility that employers could consult with individual physicians as objective third-party experts. It did not suggest that an individual physician's state of mind could excuse discrimination without regard to the objective reasonableness of his actions.

Our conclusion that courts should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments does not answer the implicit assumption in the question presented, whether petitioner's actions were reasonable in light of the available medical evidence. In assessing the reasonableness of petitioner's actions, the views of public health authorities, such as the U. S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority. *Arline, supra,* at 288; 28 CFR pt. 36, App. B, p. 626 (1997). The views of these organizations are not conclusive, however. A health care professional who disagrees with the prevailing medical consensus may refute it by citing a credible scientific basis for deviating from the accepted norm. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 32, p. 187 (5th ed. 1984).

We have reviewed so much of the record as necessary to illustrate the application of the rule to the facts of this case. For the most part, the Court of Appeals followed the proper standard in evaluating petitioner's position and conducted a thorough review of the evidence. Its rejection of the District Court's reliance on the Marianos affidavits was a correct application of the principle that petitioner's actions must be evaluated in light of the available, objective evidence. The record did not show that CDC had published the conclusion set out in the affidavits at the time petitioner refused to treat respondent. 107 F. 3d, at 946, n. 7.

A further illustration of a correct application of the objective standard is the Court of Appeals' refusal to give weight

to petitioner's offer to treat respondent in a hospital. *Id.*, at 943, n. 4. Petitioner testified that he believed hospitals had safety measures, such as air filtration, ultraviolet lights, and respirators, which would reduce the risk of HIV transmission. App. 151. Petitioner made no showing, however, that any area hospital had these safeguards or even that he had hospital privileges. *Id.*, at 31. His expert also admitted the lack of any scientific basis for the conclusion that these measures would lower the risk of transmission. *Id.*, at 209. Petitioner failed to present any objective, medical evidence showing that treating respondent in a hospital would be safer or more efficient in preventing HIV transmission than treatment in a well-equipped dental office.

We are concerned, however, that the Court of Appeals might have placed mistaken reliance upon two other sources. In ruling no triable issue of fact existed on this point, the Court of Appeals relied on the 1993 CDC Dentistry Guidelines and the 1991 American Dental Association Policy on HIV. 107 F. 3d, at 945–946. This evidence is not definitive. As noted earlier, the CDC Guidelines recommended certain universal precautions which, in CDC's view, "should reduce the risk of disease transmission in the dental environment." U. S. Dept. of Health and Human Services, Public Health Service, CDC, Recommended Infection-Control Practices for Dentistry, 41 Morbidity and Mortality Weekly Rep. No. RR–8, p. 1 (May 28, 1993). The Court of Appeals determined that, "[w]hile the guidelines do not state explicitly that no further risk-reduction measures are desirable or that routine dental care for HIV-positive individuals is safe, those two conclusions seem to be implicit in the guidelines' detailed delineation of procedures for office treatment of HIV-positive patients." 107 F. 3d, at 946. In our view, the Guidelines do not necessarily contain implicit assumptions conclusive of the point to be decided. The Guidelines set out CDC's recommendation that the universal precautions are the best way

to combat the risk of HIV transmission. They do not assess the level of risk.

Nor can we be certain, on this record, whether the 1991 American Dental Association Policy on HIV carries the weight the Court of Appeals attributed to it. The Policy does provide some evidence of the medical community's objective assessment of the risks posed by treating people infected with HIV in dental offices. It indicates:

> "Current scientific and epidemiologic evidence indicates that there is little risk of transmission of infectious diseases through dental treatment if recommended infection control procedures are routinely followed. Patients with HIV infection may be safely treated in private dental offices when appropriate infection control procedures are employed. Such infection control procedures provide protection both for patients and dental personnel." App. 225.

We note, however, that the Association is a professional organization, which, although a respected source of information on the dental profession, is not a public health authority. It is not clear the extent to which the Policy was based on the Association's assessment of dentists' ethical and professional duties in addition to its scientific assessment of the risk to which the ADA refers. Efforts to clarify dentists' ethical obligations and to encourage dentists to treat patients with HIV infection with compassion may be commendable, but the question under the statute is one of statistical likelihood, not professional responsibility. Without more information on the manner in which the American Dental Association formulated this Policy, we are unable to determine the Policy's value in evaluating whether petitioner's assessment of the risks was reasonable as a matter of law.

The court considered materials submitted by both parties on the cross-motions for summary judgment. The petitioner was required to establish that there existed a genuine

issue of material fact. Evidence which was merely colorable or not significantly probative would not have been sufficient. *Anderson* v. *Liberty Lobby, Inc.,* 477 U. S. 242, 249–250 (1986).

We acknowledge the presence of other evidence in the record before the Court of Appeals which, subject to further arguments and examination, might support affirmance of the trial court's ruling. For instance, the record contains substantial testimony from numerous health experts indicating that it is safe to treat patients infected with HIV in dental offices. App. 66–68, 88–90, 264–266, 268. We are unable to determine the import of this evidence, however. The record does not disclose whether the expert testimony submitted by respondent turned on evidence available in September 1994. See *id.,* at 69–70 (expert testimony relied in part on materials published after September 1994).

There are reasons to doubt whether petitioner advanced evidence sufficient to raise a triable issue of fact on the significance of the risk. Petitioner relied on two principal points: First, he asserted that the use of high-speed drills and surface cooling with water created a risk of airborne HIV transmission. The study on which petitioner relied was inconclusive, however, determining only that "[f]urther work is required to determine whether such a risk exists." Johnson & Robinson, Human Immunodeficiency Virus-1 (HIV–1) in the Vapors of Surgical Power Instruments, 33 J. of Medical Virology 47 (1991). Petitioner's expert witness conceded, moreover, that no evidence suggested the spray could transmit HIV. His opinion on airborne risk was based on the absence of contrary evidence, not on positive data. App. 166. Scientific evidence and expert testimony must have a traceable, analytical basis in objective fact before it may be considered on summary judgment. See *General Electric Co.* v. *Joiner,* 522 U. S. 136, 144–145, 146 (1997).

Second, petitioner argues that, as of September 1994, CDC had identified seven dental workers with possible occupa-

tional transmission of HIV. See U. S. Dept. of Health and Human Services, Public Health Service, CDC, HIV/AIDS Surveillance Report, vol. 6, no. 1, p. 15, tbl. 11 (Mid-year ed. June 1994). These dental workers were exposed to HIV in the course of their employment, but CDC could not determine whether HIV infection had resulted from this exposure. *Id.*, at 15, n. 3. It is now known that CDC could not ascertain how the seven dental workers contracted the disease because they did not present themselves for HIV testing at an appropriate time after this occupational exposure. Gooch et al., Percutaneous Exposures to HIV-Infected Blood Among Dental Workers Enrolled in the CDC Needlestick Study, 126 J. American Dental Assn. 1237, 1239 (1995). It is not clear on this record, however, whether this information was available to petitioner in September 1994. If not, the seven cases might have provided some, albeit not necessarily sufficient, support for petitioner's position. Standing alone, we doubt it would meet the objective, scientific basis for finding a significant risk to the petitioner.

Our evaluation of the evidence is constrained by the fact that on these and other points we have not had briefs and arguments directed to the entire record. In accepting the case for review, we declined to grant certiorari on question five, which asked whether petitioner raised a genuine issue of fact for trial. Pet. for Cert. i. As a result, the briefs and arguments presented to us did not concentrate on the question of sufficiency in light all of the submissions in the summary judgment proceeding. "When attention has been focused on other issues, or when the court from which a case comes has expressed no views on a controlling question, it may be appropriate to remand the case rather than deal with the merits of that question in this Court." *Dandridge* v. *Williams*, 397 U. S. 471, 476, n. 6 (1970). This consideration carries particular force where, as here, full briefing directed at the issue would help place a complex factual record in proper perspective. Resolution of the issue will be of im-

portance to health care workers not just for the result but also for the precision and comprehensiveness of the reasons given for the decision.

We conclude the proper course is to give the Court of Appeals the opportunity to determine whether our analysis of some of the studies cited by the parties would change its conclusion that petitioner presented neither objective evidence nor a triable issue of fact on the question of risk. In remanding the case, we do not foreclose the possibility that the Court of Appeals may reach the same conclusion it did earlier. A remand will permit a full exploration of the issue through the adversary process.

The determination of the Court of Appeals that respondent's HIV infection was a disability under the ADA is affirmed. The judgment is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BREYER joins, concurring.

The Court's opinion demonstrates that respondent's HIV infection easily falls within the statute's definition of "disability." Moreover, the Court's discussion in Part III of the relevant evidence has persuaded me that the judgment of the Court of Appeals should be affirmed. I do not believe petitioner has sustained his burden of adducing evidence sufficient to raise a triable issue of fact on the significance of the risk posed by treating respondent in his office. The Court of Appeals reached that conclusion after a careful and extensive study of the record; its analysis on this question was perfectly consistent with the legal reasoning in JUSTICE KENNEDY's opinion for the Court; and the latter opinion itself explains that petitioner relied on data that were inconclusive and speculative at best, see *ante*, at 653–654. Cf. *General Electric Co.* v. *Joiner*, 522 U. S. 136 (1997).

There are not, however, five Justices who agree that the judgment should be affirmed. Nor does it appear that there are five Justices who favor a remand for further proceedings consistent with the views expressed in either JUSTICE KENNEDY's opinion for the Court or the opinion of THE CHIEF JUSTICE. Because I am in agreement with the legal analysis in JUSTICE KENNEDY's opinion, in order to provide a judgment supported by a majority, I join that opinion even though I would prefer an outright affirmance. Cf. *Screws* v. *United States*, 325 U. S. 91, 134 (1945) (Rutledge, J., concurring in result).

JUSTICE GINSBURG, concurring.

Human Immunodeficiency Virus (HIV) infection, as the description set out in the Court's opinion documents, *ante*, at 635–637, has been regarded as a disease limiting life itself. See Brief for American Medical Association as *Amicus Curiae* 20. The disease inevitably pervades life's choices: education, employment, family and financial undertakings. It affects the need for and, as this case shows, the ability to obtain health care because of the reaction of others to the impairment. No rational legislator, it seems to me apparent, would require nondiscrimination once symptoms become visible but permit discrimination when the disease, though present, is not yet visible. I am therefore satisfied that the statutory and regulatory definitions are well met. HIV infection is "a physical . . . impairment that substantially limits . . . major life activities," or is so perceived, 42 U. S. C. §§ 12102(2)(A), (C), including the afflicted individual's family relations, employment potential, and ability to care for herself, see 45 CFR § 84.3(j)(2)(ii) (1997); 28 CFR § 41.31(b)(2) (1997).

I further agree, in view of the "importance [of the issue] to health care workers," *ante*, at 654–655, that it is wise to remand, erring, if at all, on the side of caution. By taking this course, the Court ensures a fully informed determina-

tion whether respondent Abbott's disease posed "a significant risk to the health or safety of [petitioner Bragdon] that [could not] be eliminated by a modification of policies, practices, or procedures . . . ." 42 U. S. C. § 12182(b)(3).

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA and JUSTICE THOMAS join, and with whom JUSTICE O'CONNOR joins as to Part II, concurring in the judgment in part and dissenting in part.

I

Is respondent Abbott (hereinafter respondent)—who has tested positive for the human immunodeficiency virus (HIV) but was asymptomatic at the time she suffered discriminatory treatment—a person with a "disability" as that term is defined in the Americans with Disabilities Act of 1990 (ADA)? The term "disability" is defined in the ADA to include:

> "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> "(B) a record of such an impairment; or
> "(C) being regarded as having such an impairment."
> 42 U. S. C. § 12102(2).

It is important to note that whether respondent has a disability covered by the ADA is an individualized inquiry. The Act could not be clearer on this point: Section 12102(2) states explicitly that the disability determination must be made "with respect to an individual." Were this not sufficiently clear, the Act goes on to provide that the "major life activities" allegedly limited by an impairment must be those "of such individual." § 12102(2)(A).

The individualized nature of the inquiry is particularly important in this case because the District Court disposed of it on summary judgment. Thus all disputed issues of material fact must be resolved against respondent. She contends

that her asymptomatic HIV status brings her within the first definition of a "disability."[1] She must therefore demonstrate, *inter alia*, that she was (1) physically or mentally impaired and that such impairment (2) substantially limited (3) one or more of her major life activities.

Petitioner does not dispute that asymptomatic HIV-positive status is a physical impairment. I therefore assume this to be the case, and proceed to the second and third statutory requirements for "disability."

According to the Court, the next question is "whether reproduction is a major life activity." *Ante*, at 638. That, however, is only half of the relevant question. As mentioned above, the ADA's definition of a "disability" requires that the major life activity at issue be one "of such individual." § 12102(2)(A). The Court truncates the question, perhaps because there is not a shred of record evidence indicating that, prior to becoming infected with HIV, respondent's major life activities included reproduction[2] (assuming

---

[1] Respondent alternatively urges us to find that she is disabled in that she is "regarded as" such. 42 U. S. C. § 12102(2)(C). We did not, however, grant certiorari on that question. While respondent can advance arguments not within the question presented in support of the judgment below, *Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 119, n. 14 (1985); *Dandridge* v. *Williams*, 397 U. S. 471, 475, n. 6 (1970), we have rarely addressed arguments not asserted below. It was the United States, not respondent, that asserted the "regarded as" argument below. The Court of Appeals declined to address it, as should we.

In any event, the "regarded as" prong requires a plaintiff to demonstrate that the defendant regarded him as having "*such* an impairment" (*i. e.*, one that substantially limits a major life activity). 42 U. S. C. § 12102(2)(C) (emphasis added). Respondent has offered no evidence to support the assertion that petitioner regarded her as having an impairment that substantially limited her ability to reproduce, as opposed to viewing her as simply impaired.

[2] Calling reproduction a major life activity is somewhat inartful. Reproduction is not an activity at all, but a process. One could be described as breathing, walking, or performing manual tasks, but a human being (as opposed to a copier machine or a gremlin) would never be described as reproducing. I assume that in using the term reproduction, respondent and the Court are referring to the numerous discrete activities that com-

for the moment that reproduction is a major life activity at all). At most, the record indicates that after learning of her HIV status, respondent, whatever her previous inclination, conclusively decided that she would not have children. App. 14. There is absolutely no evidence that, absent the HIV, respondent would have had or was even considering having children. Indeed, when asked during her deposition whether her HIV infection had in any way impaired her ability to carry out any of *her* life functions, respondent answered "No." *Ibid.* It is further telling that in the course of her entire brief to this Court, respondent studiously avoids asserting even once that reproduction is a major life activity *to her.* To the contrary, she argues that the "major life activity" inquiry should not turn on a particularized assessment of the circumstances of this or any other case. Brief for Respondent Abbott 30–31.

But even aside from the facts of this particular case, the Court is simply wrong in concluding as a general matter that reproduction is a "major life activity." Unfortunately, the ADA does not define the phrase "major life activities." But the Act does incorporate by reference a list of such activities contained in regulations issued under the Rehabilitation Act. 42 U. S. C. § 12201(a); 45 CFR § 84.3(j)(2)(ii) (1997). The Court correctly recognizes that this list of major life activities "is illustrative, not exhaustive," *ante,* at 639, but then makes no attempt to demonstrate that reproduction is a major life activity in the same sense that "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working" are. *Ante,* at 638–639.

Instead, the Court argues that reproduction is a "major" life activity in that it is "central to the life process itself." *Ante,* at 638. In support of this reading, the Court focuses on the fact that "'major'" indicates "'comparative impor-

_____

prise the reproductive process, and that is the sense in which I have used the term.

tance,'" *ibid.;* see also Webster's Collegiate Dictionary 702 (10th ed. 1994) ("greater in dignity, rank, importance, or interest"), ignoring the alternative definition of "major" as "greater in quantity, number, or extent," *ibid.* It is the latter definition that is most consistent with the ADA's illustrative list of major life activities.

No one can deny that reproductive decisions are important in a person's life. But so are decisions as to who to marry, where to live, and how to earn one's living. Fundamental importance of this sort is not the common thread linking the statute's listed activities. The common thread is rather that the activities are repetitively performed and essential in the day-to-day existence of a normally functioning individual. They are thus quite different from the series of activities leading to the birth of a child.

Both respondent, Brief for Respondent Abbott 20, n. 24, and the Government, Brief for United States as *Amicus Curiae* 13, argue that reproduction must be a major life activity because regulations issued under the ADA define the term "physical impairment" to include physiological disorders affecting the reproductive system. 28 CFR § 36.104 (1997). If reproduction were not a major life activity, they argue, then it would have made little sense to include the reproductive disorders in the roster of physical impairments. This argument is simply wrong. There are numerous disorders of the reproductive system, such as dysmenorrhea and endometriosis, which are so painful that they limit a woman's ability to engage in major life activities such as walking and working. And, obviously, cancer of the various reproductive organs limits one's ability to engage in numerous activities other than reproduction.

But even if I were to assume that reproduction *is* a major life activity of respondent, I do not agree that an asymptomatic HIV infection "substantially limits" that activity. The record before us leaves no doubt that those so infected are still entirely able to engage in sexual intercourse, give birth

to a child if they become pregnant, and perform the manual tasks necessary to rear a child to maturity. See App. 53–54. While individuals infected with HIV may choose not to engage in these activities, there is no support in language, logic, or our case law for the proposition that such voluntary choices constitute a "limit" on one's own life activities.

The Court responds that the ADA "addresses substantial limitations on major life activities, not utter inabilities." *Ante*, at 641. I agree, but fail to see how this assists the Court's cause. Apart from being unable to demonstrate that she is utterly unable to engage in the various activities that comprise the reproductive process, respondent has not even explained how she is less able to engage in those activities.

Respondent contends that her ability to reproduce is limited because "the fatal nature of HIV infection means that a parent is unlikely to live long enough to raise and nurture the child to adulthood." Brief for Respondent Abbott 22. But the ADA's definition of a disability is met only if the alleged impairment substantially "limits" (present tense) a major life activity. 42 U. S. C. § 12102(2)(A). Asymptomatic HIV does not presently limit respondent's ability to perform any of the tasks necessary to bear or raise a child. Respondent's argument, taken to its logical extreme, would render every individual with a genetic marker for some debilitating disease "disabled" here and now because of some possible future effects.

In my view, therefore, respondent has failed to demonstrate that any of her major life activities were substantially limited by her HIV infection.

## II

While the Court concludes to the contrary as to the "disability" issue, it then quite correctly recognizes that petitioner could nonetheless have refused to treat respondent if her condition posed a "direct threat." The Court of Appeals

affirmed the judgment of the District Court granting summary judgment to respondent on this issue. The Court vacates this portion of the Court of Appeals' decision, and remands the case to the lower court, presumably so that it may "determine whether our analysis of some of the studies cited by the parties would change its conclusion that petitioner presented neither objective evidence nor a triable issue of fact on the question of risk." *Ante,* at 655. I agree that the judgment should be vacated, although I am not sure I understand the Court's cryptic direction to the lower court.

"[D]irect threat" is defined as a "significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." § 12182(b)(3). This statutory definition of a direct threat consists of two parts. First, a court must ask whether treating the infected patient *without precautionary techniques* would pose a "significant risk to the health or safety of others." *Ibid.* Whether a particular risk is significant depends on:

> " '(a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.' " *School Bd. of Nassau Cty.* v. *Arline,* 480 U. S. 273, 288 (1987).

Even if a significant risk exists, a health practitioner will still be required to treat the infected patient if "a modification of policies, practices, or procedures" (in this case, universal precautions) will "eliminat[e]" the risk. § 12182(b)(3).

I agree with the Court that "[t]he existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the treatment or accommodation," as of the time that the decision refusing treatment is made. *Ante,* at 649. I disagree with the Court, however,

that "[i]n assessing the reasonableness of petitioner's actions, the views of public health authorities . . . are of special weight and authority." *Ante*, at 650. Those views are, of course, entitled to a presumption of validity when the actions of those authorities themselves are challenged in court, and even in disputes between private parties where Congress has committed that dispute to adjudication by a public health authority. But in litigation between private parties originating in the federal courts, I am aware of no provision of law or judicial practice that would require or permit courts to give some scientific views more credence than others simply because they have been endorsed by a politically appointed public health authority (such as the Surgeon General). In litigation of this latter sort, which is what we face here, the credentials of the scientists employed by the public health authority, and the soundness of their studies, must stand on their own. The Court cites no authority for its limitation upon the courts' truth-finding function, except the statement in *School Bd. of Nassau Cty.* v. *Arline*, 480 U. S., at 288, that in making findings regarding the risk of contagion under the Rehabilitation Act, "courts normally should defer to the reasonable medical judgments of public health officials." But there is appended to that dictum the following footnote, which makes it very clear that the Court was urging respect for *medical* judgment, and not necessarily respect for "official" medical judgment over "private" medical judgment: "This case does not present, and we do not address, the question whether courts should also defer to the reasonable medical judgments of private physicians on which an employer has relied." *Id.*, at 288, n. 18.

Applying these principles here, it is clear to me that petitioner has presented more than enough evidence to avoid summary judgment on the "direct threat" question. In June 1994, the Centers for Disease Control and Prevention published a study identifying seven instances of possible transmission of HIV from patients to dental workers. See *ante*,

at 654. While it is not entirely certain whether these dental workers contracted HIV during the course of providing dental treatment, the potential that the disease was transmitted during the course of dental treatment is relevant evidence. One need only demonstrate "risk," not certainty of infection. See *Arline, supra,* at 288 (" '[T]he probabilities the disease will be transmitted' " is a factor in assessing risk). Given the "severity of the risk" involved here, *i. e.,* near certain death, and the fact that no public health authority had outlined a protocol for *eliminating* this risk in the context of routine dental treatment, it seems likely that petitioner can establish that it was objectively reasonable for him to conclude that treating respondent in his office posed a "direct threat" to his safety.

In addition, petitioner offered evidence of 42 documented incidents of occupational transmission of HIV to health care workers other than dental professionals. App. 106. The Court of Appeals dismissed this evidence as irrelevant because these health professionals were not dentists. 107 F. 3d 934, 947 (CA1 1997). But the fact that the health care workers were not dentists is no more valid a basis for distinguishing these transmissions of HIV than the fact that the health care workers did not practice in Maine. At a minimum, petitioner's evidence was sufficient to create a triable issue on this question, and summary judgment was accordingly not appropriate.

JUSTICE O'CONNOR, concurring in the judgment in part and dissenting in part.

I agree with THE CHIEF JUSTICE that respondent's claim of disability should be evaluated on an individualized basis and that she has not proved that her asymptomatic HIV status substantially limited one or more of her major life activities. In my view, the act of giving birth to a child, while a very important part of the lives of many women, is not generally the same as the representative major life activities of

all persons—"caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"—listed in regulations relevant to the Americans with Disabilities Act of 1990. See 45 CFR § 84.3(j)(2)(ii) (1997); 28 CFR § 41.31(b)(2) (1997). Based on that conclusion, there is no need to address whether other aspects of intimate or family relationships not raised in this case could constitute major life activities; nor is there reason to consider whether HIV status would impose a substantial limitation on one's ability to reproduce if reproduction were a major life activity.

I join in Part II of THE CHIEF JUSTICE's opinion concurring in the judgment in part and dissenting in part, which concludes that the Court of Appeals failed to properly determine whether respondent's condition posed a direct threat. Accordingly, I agree that a remand is necessary on that issue.