**Brian K. SPRADLEY, Plaintiff,**

v.

**CUSTOM CAMPERS, INC., Defendant.**

**Civil Action No. 98–2577–KHV.**

United States District Court, D. Kansas.

Aug. 19, 1999.

---

James L. Wisler, Schroer, Rice, P.A., Topeka, KS, for plaintiff.

John I. O'Connor, Troy A. Unruh, Pittsburg, KS, for defendant.

Richard Shaw, Chanute, KS, for movant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Brian K. Spradley brings suit against his former employer, Custom Campers, Inc., for discrimination in violation of 42 U.S.C. § 2000e *et seq.* (Title VII), disability discrimination in violation of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.,* and retaliatory discharge under the Kansas Workers' Compensation Act, K.S.A. § 44–501 *et seq.* This matter comes before the Court on *Defendant's Motion For Summary Judgment* (Doc. # 28) filed June 15, 1999. For reasons set forth below, the Court finds that defendant's motion should be sustained.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.,* 912

F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics*, 912 F.2d at 1241.

In ruling on summary judgment, the Court will disregard conclusory statements and statements not based on personal knowledge. *Cole v. Ruidoso Municipal Schools*, 43 F.3d 1373, 1382 (10th Cir.1994) (regarding conclusory statements); *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir.1995) (requiring personal knowledge).

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.*, 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

### Facts

The facts are set forth below viewed in a light most favorable to plaintiff.

In 1993, while working for the Kansas Department of Transportation, plaintiff Brian K. Spradley blacked out at work. Dr. Robert Thomen, a board certified physician and plaintiff's doctor since 1990, examined plaintiff after the incident. At Dr. Thomen's direction Dr. Harold Goldman, a neurologist, performed an EEG on plaintiff. Dr. Goldman interpreted the 1993 EEG results as normal. Dr. Thomen then diagnosed plaintiff's 1993 blackout as a probable vasovagal incident. A vasovagal incident is when the blood sugar and blood pressure drop, causing one to faint.

Dr. Thomen did not prescribe any medication or treatment for plaintiff after the 1993 EEG, and placed no restrictions on his work.

In August 1994, plaintiff went to work for Custom Campers, Inc. On August 14, 1994, he filled out a new employee information sheet. He did not list seizures or epilepsy as a medical condition because at that time he did not believe that he had such a disorder.

Custom Campers manufactures fifth wheel recreational vehicles at its plant in Chanute, Kansas. The plant is in a large building—350 feet by 150 feet with an attached office that is 4,000 square feet. The plant contains two lanes which forklifts cross all day, and workers also cross these lanes on a frequent basis. The plant has two industrial compactors that produce approximately 25,000 pounds of pressure. The compactors are large enough that a person could fall into them.

In May of 1996, Custom Campers counseled plaintiff on an attendance problem and he took a leave of absence to deal with personal problems. His need to leave work interfered with his job performance.

From December 1, 1994 to May 1, 1995, plaintiff suffered a series of traumas at work, resulting in injuries to his right elbow, right shoulder, and left elbow. After an absence due to these injuries, plaintiff returned to work on September 5, 1995. Defendant assigned him to a light duty maintenance job but afforded him his pre-injury wages and benefits and plaintiff earned more than the other maintenance workers at Custom Campers. Two days after he returned to work, on September 7, 1995, plaintiff suffered a seizure at work. He was taken to the emergency room and then admitted to the hospital. On September 9, 1995, Dr. Goldman performed a second EEG on plaintiff. Dr. Goldman noted no seizure discharges or seizure disorders at that time. Plaintiff returned to work two days later with no further restrictions. He also brought Pam Sheble, the personnel and safety director, a copy

of a prescription for Dolobid which he had been taking for his previous elbow injury, and told her that he thought that the Dolobid might have caused him to faint.

On February 8, 1996, plaintiff filed an application for benefits under the Kansas Workers' Compensation Act, and on April 17, 1996, he settled that claim with Custom Campers. In the meantime, on April 1, 1996, Dr. Goldman diagnosed plaintiff with a generalized seizure disorder and prescribed Dilantin to be taken daily to reduce the likelihood of seizures. Dr. Goldman noted that plaintiff tends to have seizures when he is under stress or has not eaten. Dr. Goldman advised plaintiff that Dilantin is a preventative medicine and must be taken daily to be effective. If Dilantin is discontinued or is not taken regularly it will probably cause a seizure. Dilantin is not the type of medicine that can be taken to prevent a seizure if one feels it coming. In fact, a patient cannot always tell when a seizure is imminent, and it is almost impossible to abort a seizure. Some patients have an "aura" before they have a seizure. It is not a reliable indicator of a seizure, however, and it does not always occur. It is possible that a seizure patient with a reliable aura can avoid injury by lying down when he or she has an aura. Dr. Goldman testified that someone who is diagnosed with an uncontrolled seizure disorder is prohibited from driving, climbing in high places, and being around hazardous machinery because those activities are dangerous. Because seizure control is never perfect, these prohibitions apply to all seizure patients, even those on Dilantin, especially where the patient has a predilection for seizures because of stress or not eating well.

On April 1, 1996, Dr. Goldman told plaintiff that he should not drive a vehicle or be around hazardous machinery, even if he was taking Dilantin. Dr. Thomen had previously advised plaintiff, on March 25, 1996, not to drive a car and not to work around hazardous machinery.

Plaintiff's workers' compensation claim was to become final on September 7, 1997, two years after he returned to work in the light duty position at Custom Campers. It was a "running award," however, and it was subject to review and modification until April 17, 1998. Custom Campers paid plaintiff's medical bills related to his work injuries and plaintiff was satisfied with his medical treatment.

Custom Campers does not have a policy of terminating employees who file workers' compensation claims, and it has a policy of returning injured workers to jobs within their restrictions at the same wage and benefit level as before the injuries. Although no one at Custom Campers ever specifically mentioned the workers' compensation claim to Spradley after his injury. Pam Sheble told him that "we are spending a lot of money on you." Spradley Depo., Ex. 1, p. 55.

The maintenance position was the only position that his physician plaintiff to perform, based on his workers' compensation restrictions. Part of his job as a maintenance worker was to clean around numerous saws in the plant while the saws were operating.

Sometime after he started working in the maintenance position, plaintiff told Travis Hamilton, his supervisor, that he had medicine to take if he felt a seizure coming on. He also asked Hamilton if he could lie down if he felt a seizure coming on. Hamilton agreed to let him lie down and then go home afterward. Plaintiff told Hamilton on about five to ten occasions that he was about to have a seizure, and then went home afterward. Although Hamilton asked Sheble for a doctor's note concerning Spradley's seizures, she did not have one. Hamilton did not believe that plaintiff actually had a seizure disorder or that he was disabled.

Custom Campers denied workers' compensation benefits for the fall that plaintiff suffered on September 7, 1995, on the ground that plaintiff had suffered some kind of seizure. Sheble knew of this deni-

al. Custom Campers also had Dr. Neef's notes from the 1995 "black-out," in which Dr. Neef made no conclusive diagnosis but made a note to rule out seizures, thus indicating that a seizure could be the ultimate diagnosis. Sheble and Jerry Whitworth, president of Custom Campers, mistakenly thought that Dr. Neef's records ruled out a possibility of a seizure. When Sheble called Dr. Neef after the first incident, he told her that he was not sure why plaintiff had blacked out. Whitworth testified that he was aware of no medical evidence that plaintiff had been diagnosed with seizures, although he had seen Dr. Neef's report that seizures should be ruled out, and he had seen a letter of October 11, 1995, which denied a workers' compensation claim for the fall on September 7, 1995, on the grounds that plaintiff had suffered some kind of seizure. Whitworth testified that he knew that plaintiff had dizzy spells and had blacked out. Plaintiff asserts that Whitworth knew he had seizures.

On December 13, 1996, plaintiff blacked out and fell by the trash compactor at Custom Campers. During that period, he was not taking the prescribed Dilantin. The Dilantin would have reduced the likelihood of a seizure.

As a maintenance worker, plaintiff was in the "safest job" available at Custom Campers. Plaintiff points to an EEOC determination that he could have cleaned offices, break rooms and areas of the plant that did not involve hazardous machinery. Defendant, however, presented uncontroverted evidence that office cleaning would take only about two hours per day. Plaintiff asserts that Custom Campers had other jobs he could do, including putting stripes on RV units, supervising in the metal department, running a screw gun part-time, or wiring. Custom Campers presented evidence, however, that the maintenance position was the only one plaintiff was authorized to perform due to

his workers' compensation restrictions, and plaintiff does not controvert this fact. No clerical position was available and plaintiff had no education or training beyond a high school diploma. Custom Campers had no work that plaintiff could perform where he could not get hurt or hurt others due to his seizures.

Custom Campers terminated plaintiff's employment on December 19, 1996, because of the safety risk he posed to himself and other employees. Hamilton, plaintiff's supervisor, felt that plaintiff was a safety risk, and agreed with the decision to terminate plaintiff for safety reasons. Before terminating plaintiff's employment, Custom Campers made no medical investigation to determine whether plaintiff was having seizures. It reviewed the results of two hospital drug tests that came back negative. Whitworth did not talk to plaintiff before he decided to terminate him. At the time, Whitworth did not know what plaintiff's assigned area was and did not discuss with Sheble or Hamilton the possibility of moving plaintiff to a safer area. Nor did Whitworth discuss accommodating plaintiff. Plaintiff produced no evidence, however, that he asked for any accommodation other than lying down if he felt a seizure coming on.

Although plaintiff was reported for frequent absenteeism and tardiness due to "personal problems," neither Sheble nor anybody else recommended that Custom Campers terminate him for those reports.[1] Although Whitworth, Sheble, and Hamilton discussed possible termination of plaintiff for attendance problems before December 16, 1996, they decided not to terminate him for those problems. Custom Campers presented evidence that it had done so, however, for other employees.

Plaintiff has not informed the Kansas Department of Motor Vehicles about his seizure disorder. He does not believe that

---

1. Plaintiff left work early for non-seizure related incidents once a week, and was tardy once a week. About one to one and one half times per week, he called Hamilton to tell him that he would not be at work.

the disorder hampers his ability to drive. He also does not believe that it affects his ability to play softball, hunt or fish.

Plaintiff is not currently taking Dilantin and he is not presently under a doctor's care.

## ANALYSIS

### A. Discrimination

 The ADA prohibits a covered entity from discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. *See* 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires" *Pack v. Kmart Corp.,* 166 F.3d 1300, 1302 (10th Cir.1999) (quoting 42 U.S.C. § 12111(8)). To establish a prima facie case under the ADA, plaintiff must demonstrate that (1) he is disabled within the meaning of the ADA; (2) he is qualified, that is, with or without reasonable accommodation, he is able to perform the essential functions of the job; and (3) defendant discriminated against him because of his disability. *See Pack,* 166 F.3d at 1302.

 If plaintiff establishes a prima facie case, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its employment decision. *See Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *EEOC v. Flasher Co.,* 986 F.2d 1312, 1317–19 (10th Cir.1992)). If defendant comes forward with a nondiscriminatory reason for its actions, the burden then shifts back to plaintiff to show "a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Randle,* 69 F.3d at 451. If plaintiff proffers such evidence, the motion for summary judgment must be denied. *Id.* The

*McDonnell Douglas* burden-shifting analysis is appropriate in disability discrimination cases where plaintiff has no direct evidence of discrimination and the employer disclaims reliance on plaintiff's disability for an employment decision. *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 n. 3 (10th Cir.1997). "If the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate." *Id.* (citing *White v. York Int'l Corp.,* 45 F.3d 357, 361 n. 6 (10th Cir.1995). *See also Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1184–85 (6th Cir.1996)).

In *Bragdon v. Abbott,* 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court explained that consideration of the definition proceeds in three steps. First, the court must determine whether plaintiff has an impairment. Second, the court must identify the life activity upon which plaintiff relies and determine whether it constitutes a major life activity under the ADA. Third, the court asks whether the impairment substantially limited the major life activity. *Id.* Thus *Bragdon* makes clear that whether a claimed affliction constitutes an impairment under the ADA and whether the identified endeavor constitutes a major life activity are determinations of law for the court to decide. A plaintiff must specifically plead or prove at trial the impairments and the major life activities he asserts are at issue. *Bragdon,* 118 S.Ct. at 2205. In construing the ADA provisions, the Supreme Court has relied upon regulations interpreting both the ADA and the Rehabilitation Act of 1973. *See Bragdon,* 118 S.Ct. at 2202–05.

When the Department of Health and Human Services issued regulations defining impairment under the ADA, it adopted the Rehabilitation Act regulations. Under those regulations, a physical or mental impairment is:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or physical disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (1998). Although this definition is not a comprehensive enumeration, the commentary accompanying the Rehabilitation Act regulations "contains a representative list of disorders and conditions constituting physical impairments, including 'such diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, *epilepsy*, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, and ... drug addiction and alcoholism.'" *Bragdon*, 118 S.Ct. at 2202 (quoting 42 Fed. Reg. 22685 (1977), reprinted in 45 C.F.R. pt. 84, app. A at 334 (1997)).

In this case, plaintiff has presented evidence that he suffers from a seizure disorder. The Court finds that under the regulations set forth above a seizure disorder is a physical impairment *See LaChance v. Duffy's Draft House*, 146 F.3d 832 (11th Cir.1998) (assuming without analysis that employee who suffered from epilepsy had a disability). The next question is whether plaintiff has produced evidence that this impairment substantially affects a major life activity.

The ADA and Rehabilitation Act regulations aid a court in determining whether a particular endeavor may properly be considered a major life activity.

Rather than enunciating a general principle for determining what is and is not a major life activity, [these] regulations instead provide a representative list, defining [the] term to include "functions such as caring for one's self, performing

manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

*Bragdon*, 118 S.Ct. at 2205 (quoting 45 C.F.R. § 84.3(j)(2)(ii) (1997); 28 C.F.R. § 41.31(b)(2) (1997)); *see also* 29 C.F.R. § 1630.2(i) (1998). "This list is not exhaustive. For example, other major life activities include, but are not limited to, sitting, standing, lifting, and reaching." 29 C.F.R. pt. 1630, app. at 347 (1998).

■ In making determinations of law and formulating jury instructions, "the court is to analyze only the major life activity asserted by the plaintiff." *Poindexter v. Atchison, Topeka, & Santa Fe R.R. Co.*, 168 F.3d 1228, 1232 (10th Cir. 1999) (citing *Bragdon*, 118 S.Ct. at 2205) (explicitly limiting its analysis to the major life activity of reproduction and declining to speculate about other possible major life activities that HIV infection might have impaired). Thus, in order to prevail on a claim under the ADA, a plaintiff must "articulate with precision the impairment alleged and the major life activity affected by that impairment." *Poindexter* at 1232.

Plaintiff asserts that the major life activities include the way he performs manual tasks, walks, sees, hears and works. In support of this assertion he cites testimony by Dr. Goldman and Dr. Thomen that someone with an uncontrolled seizure disorder is prohibited from performing activities such as driving, climbing in high places, and being around hazardous machinery or operating heavy machinery because these activities are dangerous. As defendant points out, however, plaintiff continues to drive a car and performs day to day tasks.

Further, plaintiff has conceded that on both occasions when he had seizures at work, he was not taking Dilantin, which was prescribed to reduce the chance of a seizure. The Supreme Court has recently held that if a disorder can be controlled by medication or other corrective measures, it does not substantially limit a major life activity. *See Murphy v. United Parcel*

*Serv., Inc.,* —— U.S. ——, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999). Although the facts indicate that taking Dilantin will not necessarily eliminate seizures, it would make it far less likely that he would have seizures. Plaintiff does not address this issue.

 Even if plaintiff had established that he has a disability, he failed to show that he is an "otherwise qualified individual." Defendant points to plaintiff's frequent absences and tardiness, which plaintiff concedes were not due to his alleged disability. An essential function of nearly every job is that the employee attend work. But more importantly, an otherwise qualified individual must be able to perform the essential functions of the position in question without endangering the health and safety of himself or others. *See Chiari v. City of League,* 920 F.2d 311, 317 (5th Cir.1991). The undisputed facts show that when plaintiff had his seizure in December 1996, he was near an industrial trash compactor. Had he fallen into the compactor he certainly would have been injured, if not killed. "An individual is not qualified for a job if there is a genuine substantial risk that he or she could be injured or injure others, and the employer cannot modify the job to eliminate the risk." *Chandler v. City of Dallas,* 2 F.3d 1385, 1393 (5th Cir.1993); *La Chance,* 146 F.3d at 835. Defendant has produced uncontroverted evidence that plaintiff was in the safest position that he was qualified to occupy at the plant. Although plaintiff suggests that he could have cleaned offices, the evidence is that that job would take only two hours a day.

For all of the reasons stated, Custom Campers is entitled to summary judgment on plaintiff's claim that it discriminated against him when it terminated his employment.

2. "[A] person is 'regarded as having' an impairment that substantially limits the person's major life activities when other people treat the person as having a substantially limiting impairment, regardless of whether the indi-

In response to Custom Camper's summary judgment motion, plaintiff attempts to rely upon the ADA Section 12102(2)(c) "regarded as" provision.[2] As Custom Campers points out, however, plaintiff did not plead that Custom Campers regarded or treated him as if he were disabled. More importantly, the *Pretrial Order* (Doc. # 27) does not include the issue of perceived disability as a question of fact or law. Thus defendant was not on notice of such a claim and plaintiff cannot raise it at this point.

## B. Reasonable Accommodation

Because plaintiff failed to produce facts that show that he was disabled, we need go no further. In the pretrial order, however, plaintiff complains that defendant did not reasonably accommodate his request that he be allowed to take a break or go home when he felt a seizure coming on. Specifically, plaintiff claims:

> Plaintiff requested an accommodation for his disability by allowing him to take a break or go home when he felt a seizure coming on. Defendant could have accommodated the Plaintiff's disability without undue hardship.

*Pretrial Order* (Doc. # 27) filed June 4, 1999, p. 2. This language appears to speak only to the requested accommodation of taking a break or going home, and not restructuring job requirements or transferring plaintiff to another job.

In this context, the Tenth Circuit recently stated in *Smith v. Midland Brake,* 180 F.3d 1154 (10th Cir.1999):

> Although a "qualified individual with a disability" has to be someone who can perform the essential functions of a job, that inquiry is not limited to the employee's existing job. Rather, the plain language of the statute includes an employee who has the ability to do other jobs

vidual actually has an impairment." *Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 903 (10th Cir.1997) *aff'd,* —— U.S. ——, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (citations and quotations omitted).

within the company that such disabled employee "desires." 42 U.S.C. § 12111(8).

To survive summary judgment on an ADA claim of failure to accommodate by offering reassignment to a vacant position, the employee initially bears the burden of production with respect to a prima facie case. For the employee to make such a prima facie case, he or she must make an initial showing that: (1) The employee is a disabled person within the meaning of the ADA and has made any resulting limitations from his or her disability known to the employer; (2) The preferred option of accommodation within the employee's existing job cannot reasonably be accomplished; (3) *The employee requested the employer reasonably to accommodate his or her disability by reassignment to a vacant position, which the employee may identify at the outset or which the employee may request the employer identify through an interactive process, in which the employee in good faith was willing to, or did, cooperate;* (4) *The employee was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made;* and (5) The employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.

*Id.* at 1179 (emphasis added). "Although reasonableness is the underlying qualifier on an employer's duty to reassign, there may be cases where, for example, the record is clear that the employee failed to take the necessary steps to initiate or participate in the interactive process." *Id.* at 1180.

■ In this case, plaintiff has shown no evidence that he requested reassignment. Thus he does not meet the third element of *Midland Brake.* Even if he had, plaintiff then must show that he was qualified for an identified vacant position. Plaintiff asserts that he could have performed maintenance work in the offices, but the undisputed evidence is that such work would take only 25 percent of the work day. Plaintiff then offers his subjective opinion that he could have performed various other jobs, including supervisor in the metal department, putting stripes on RV units, running a screw gun part time, or doing wiring. He does not present in his factual contentions any information concerning the qualifications for these jobs, whether he had met the qualifications, or whether any such positions were either available or anticipated at the time Custom Campers terminated his employment. Further, as Custom Campers points out, the maintenance position was the only one that his doctor authorized, based on his workers' compensation restrictions.

Plaintiff has failed to make out a prima facie case of failure to accommodate through reassignment. A qualified individual with a disability must satisfy the requisite skill, experience, education and other job-related requirements of the employment position, and with or without reasonable accommodation be able to perform the essential functions of the position. The ADA requires employers to provide reasonable accommodations for known disabilities unless those accommodations would result in undue hardship for the employer. An accommodation is reasonable only if it enables an employee to perform the essential functions of the job. The ADA defines I essential functions to be the fundamental job duties of the employment position, in contrast to "marginal" functions.

In this case, Custom Campers admits that it fired plaintiff because of the risk that he posed to himself and others on account of his seizures. Although plaintiff refers to the accommodation that he had previously received, of being able to lie down or leave work when he felt a seizure might occur, he also admits that he did not anticipate at least one of the two seizures he suffered at work. Thus, he does not

contest Custom Camper's assertion that he posed a safety risk to himself or others if he continued his duties as a janitor in the manufacturing section of the plant, and he does not point to evidence that he could have continued to work in his position with reasonable accommodation—he does not offer evidence that Custom Campers could have made safe his work as a janitor in the manufacturing area. *See LaChance*, 146 F.3d at 835–36 (plaintiff diagnosed with epilepsy posed risk to self and others because of appliances he used in duties of line cook; plaintiff did not point to any evidence that reasonable accommodations could have made work site safe; thus employer entitled to summary judgment).

## C. Retaliation Claim

■ Kansas recognizes exceptions to the employment-at-will doctrine where an employee is terminated in violation of public policy. One public policy exception is the termination of an employee in retaliation of the exercise of rights under the Kansas workers' compensation laws. *Murphy v. City of Topeka–Shawnee County Dept. of Labor Services*, 6 Kan.App.2d 488, 630 P.2d 186 (1981).

■ In cases which involve a retaliatory discharge claim, the Kansas Supreme Court has adopted the *McDonnell Douglas* burden-shifting analysis. *See Ortega v. IBP, Inc.*, 255 Kan. 513, 526, 874 P.2d 1188, 1196 (1994). First, plaintiff must present a prima facie case of discrimination. Then the burden of going forward with the evidence shifts to defendant and "this burden may be discharged by evidence of a legitimate, nondiscriminatory reason for [its] conduct." *Id.* If defendant meets this obligation, plaintiff must then prove that "the reasons offered by [defendant] were merely a pretext for discrimination." *Id.* (quotation omitted). Under Kansas law, the party "having the burden of proving a discharge from employment in retaliation for having filed a workers' com-

pensation claim must establish that claim by a preponderance of the evidence, but the evidence must be clear and convincing in nature." *Ortega*, 255 Kan. at 528, 874 P.2d at 1198.

■ A prima facie case consists of four elements: (1) the employee has filed a workers' compensation claim; (2) the employer had knowledge of the workers' compensation claim or the fact that the employee had sustained a work-related injury; (3) the employer terminated the employee; and (4) there is a causal connection between the protected activity or injury and the termination. *Ortega*, 255 Kan. at 526, 874 P.2d at 1197. In this case, plaintiff has set forth facts establishing the first three elements. Thus the Court must address whether plaintiff has presented evidence of a causal connection between his workers' compensation claim and the termination of his employment.

Plaintiff's only evidence of a causal connection is that (1) he filed a workers' compensation claim; (2) Custom Campers fired him over ten months later; and (3) at some time during his employment, Sheble told plaintiff that "we are spending a lot of money on you." The Court doubts whether this evidence is sufficient as a matter of law to establish a causal connection between the protected activity and the termination. *See e.g., Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (absent additional evidence, four-month gap between protected activity and alleged retaliation was insufficient for prima facie case).

■ Even assuming that plaintiff has established a prima facie case of wrongful termination, however, Custom Campers has met its burden of articulating a non-discriminatory reason for the termination. Custom Campers has produced evidence that it terminated plaintiff because it was concerned for his safety as well as the safety of other employees.[3] Kansas courts

**3.** As plaintiff points out, defendant also appears to rely to some degree on the fact that plaintiff was frequently late to work or missed work for reasons other than his seizure disor-

der. Defendant points out that it has fired other employees for such infractions. But defendant's argument seems to center on the

clearly hold that even an employee with a workers' compensation claim may be terminated under a neutral company policy. *See Rowland v. Val–Agri, Inc.,* 13 Kan. App.2d 149, 766 P.2d 819 (1988) (company discharged employee pursuant to policy that provided for automatic discharge of any person absent from work for six months for any reason). Custom Campers satisfied its burden by establishing a concern for safety as a legitimate reason for dismissing plaintiff. Thus the burden returns to plaintiff to establish by clear and convincing evidence that the legitimate reason offered by defendant was a pretext for discrimination. *See Ortega,* 255 Kan. at 528, 874 P.2d at 1198 (plaintiff must show retaliation by clear and convincing evidence). Evidence which is clear and convincing is "certain, unambiguous, and plain to the understanding." *Id.*

Whether defendant retaliated against plaintiff for the filing of a workers' compensation claim turns on the question of the employer's intent. For purposes of this motion, plaintiff has the burden to produce evidence, direct or circumstantial, from which a reasonable juror could conclude by clear and convincing evidence that Custom Campers retaliated against him for pursuing workers' compensation benefits. *See Marquardt v. Miles, Inc.,* 1994 WL 171698 * 6 (D.Kan. Apr.14, 1994). The fact that temporal proximity may support an inference of causation sufficient to establish a plaintiff's prima facie case does not automatically demonstrate that a defendant's proffered justifications are pretextual. While a discharge is retaliatory if "the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights." *Martin v. Gingerbread House, Inc.,* 977 F.2d 1405, 1408 (10th Cir.1992) (citations and footnote omitted), an inference of causation sufficient to establish a prima facie case of discrimination is not sufficient to meet plaintiff's ultimate burden of proving that the protected action was indeed the cause

of the discharge. Once the employer meets the second step of *McDonnell Douglas,* the inference of causation drops out, and plaintiff must offer some evidence of pretext in the employer's legitimate reason. *See Conner,* 121 F.3d at 1397. Plaintiff has failed to offer evidence of pretext beyond the one statement that he was costing Custom Campers a lot of money. While such a statement made by a decision maker in close proximity to the termination might be sufficient evidence of pretext, in the instant case plaintiff has produced no evidence of exactly when the statement was made. Without more, this Court finds that plaintiff has failed to rebut Custom Camper's evidence of a legitimate business reason for discharging him.

**IT IS THEREFORE ORDERED** that *Defendant's Motion For Summary Judgment* (Doc. # 28) filed June 15, 1999, be and hereby is **SUSTAINED**.

---

safety issue as the deciding factor. In any event, plaintiff has not contested the fact that he was frequently late or absent for reasons

other than his seizure disorder and his work-related injury.