*59 LIPEZ, Circuit Judge,
concurring.
I concur with the result reached by the majority because I think that Dr. Chie’s evidence shows that his decision to transfer Lesley was medically reasonable. However, we do not have to decide in this case, as the majority does, that a plaintiff like Lesley must show medical unreasonableness “within some larger theory of disability discrimination,” such as animus, fear, apathetic attitudes, or stereotyping, to avoid a possible conflict between § 504 of the Rehabilitation Act and state medical malpractice law, or undue intrusion on the doctor-patient relationship. Given the emerging nature of disability law and the high stakes involved, we should only decide those difficult and important issues when we must.
As the majority notes, “Lesley argues that Dr. Chie’s decision to transfer her was so lacking in any reasonable medical support as to suggest it was pretext for discrimination.” The premise of Lesley’s argument is wrong simply because there is reasonable medical support for Dr. Chie’s decision. The majority demonstrates this point convincingly, for example by pointing to such evidence as Leominster Hospital’s lack of an AZT protocol at the time Lesley was transferred. Since Lesley loses on that ease-specific basis alone, there is no basis for finding pretext. Yet the majority goes on to make the general point that a § 504 plaintiff like Lesley must always show that a doctor’s decision not to treat her “was unreasonable in a way that reveals it to be discriminatory.” I understand this rule to mean that a disabled patient has no recourse under § 504 when a doctor decides to transfer the patient to another health-care provider after explicit consideration of the medical effects of his or her disability, even if there is no reasonable medical evidence to support the deeision not to treat, unless the absence of reasonable medical evidence permits an inference of some discriminatory motive, such as animus, fear, or stereotyping of the disabled.
This may be a good rule, and the majority presents the arguments for it well. But there are also reasons for caution. There is nothing in the language of § 504 that dictates or even suggests that an actionable exclusion from participation in a federal program or an actionable denial of federal benefits may not occur apart from a showing of discrimination. See 29 U.S.C. § 794 (“No otherwise qualified handicapped individual ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.”). If a doctor’s decision not to treat the medical effects of a patient’s disability, and transfer the patient elsewhere, is based only on an unreasonable medical judgment, it can be argued that the denial of services to the patient is “solely by reason of her or his disability.” Id.
Moreover, although I share the majority’s concern about undue interference with the doctor-patient relationship through Rehabilitation Act claims, I question whether claims such as Lesley’s pose that threat in one of its most troubling forms — the “battle of experts” at trial requiring a factfin-der to choose between a doctor’s and a patient’s competing versions of the right treatment. In Bragdon v. Abbott, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court said that the views of public health authorities have “special weight and authority” in assessing the reasonableness of a doctor’s actions. Id. at 650, 118 S.Ct. 2196. However, the Court also said that “[a] health care pro *60 fessional who disagrees with the prevailing medical consensus may rebut it by citing a credible scientific basis for deviating from the accepted norm.” Id. In other words, when competing views exist side by side at summary judgment, with the plaintiffs experts representing the prevailing practice and the defendant’s experts representing a contrary but reasonable view, the court may still grant summary judgment to the defendant without deciding who is right. In my view, Lesley’s evidence- — Dr. Min-koffs testimony, the MDPH Clinical Advisory, and the U.S. Public Health Service guidelines — represents the “prevailing medical consensus” that any licensed obstetrician is qualified to administer AZT. Id. However, the expert testimony offered on behalf of Dr. Chie justifies summary judgment by providing a “credible scientific basis” for Dr. Chie’s deviation from the accepted norm. Id.
Although I agree with the majority that Lesley’s case is unlike Bragdon v. Abbott, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), because it involves a doctor’s concern about a potential threat to the health of his patient rather than to his own health, this is still a denial of services case. What is at issue here is not Dr. Chie’s improper medical treatment of Lesley— the standard bad medicine malpractice claim — but his decision not to treat her and instead to send her to another healthcare provider. Because I see the case in this way, I do not share the majority’s concern that we must use this ease to announce a rule that will bar the federalization of state medical malpractice law and undue intrusion on the doctor-patient relationship under the aegis of the Rehabilitation Act.
To be sure, rules are important in establishing the parameters of litigation. But we should not establish rules prematurely. We know that careful, case-specific judicial inquiry has already helped to resolve difficult denial of treatment claims. One commentator has noted that “Brag-don v. Abbott and the cases involving pre-textual referrals illustrate how the ADA can act as a powerful limit on the ability of health care providers to refuse to provide treatment to individuals with HIV infection” and “send a clear message to medical and dental providers that refusals to treat are illegitimate and illegal.” Mary Crossley, Becoming Visible: The ADA’s Impact on Health Care for Persons with Disabilities, 52 Ala. L.Rev. 51, 59 (2000). There may or may not be a similar need for a limit on the ability of health care providers to refer disabled patients elsewhere because of an unreasonable medical judgment about the medical effects of the disability, irrespective of pretext.[1] This is not the case to decide that issue.

. Studies show that patients with HIV sometimes do not get the care they need because doctors are reluctant to treat them for a variety of reasons. See Crossley, supra, at 59 n. 40 (citing studies).