Jonathan HAAS, M.D., Plaintiff,

v.

**WYOMING VALLEY HEALTH CARE SYSTEM, Defendant.**

No. 3:03–CV–1966.

United States District Court, M.D. Pennsylvania.

Dec. 6, 2006.

David Paul Tomaszewski, Kimberly D. Borland, Borland and Borland, L.L.P., Wilkes–Barre, PA, Tiffany M. Quick, Minneapolis, MN, for Plaintiff.

Philip G. Kircher, Debra S. Friedman, Cozen and O'Connor, Philadelphia, PA, for Defendant.

### *MEMORANDUM*

CAPUTO, District Judge.

Presently before the Court is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 66–1.) For the reasons set forth below, Defendant's motion will be denied.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 [1] ("federal question") and 28 U.S.C. § 1343 [2] ("civil rights and elective franchise").

---

1. The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331.

2. The district courts shall have original juris-

## BACKGROUND

Defendant Wyoming Valley Health Care System, Inc. ("WVHCS") is a not-for-profit healthcare system which operates an acute-care hospital known as Wilkes–Barre General Hospital ("the Hospital"). (Doc. 70 ¶ 1.) The physicians who perform services at the Hospital are not employees of WVHCS. (Doc. 70 ¶ 3.) In August of 2000, Plaintiff Jonathan Haas ("Dr.Haas") began the application process to gain privileges as an orthopedic surgeon at the Hospital. (Doc. 70 ¶ 25.) Dr. Haas did not apply for employment with the Hospital itself, nor was he ever employed by the Hospital. (Doc. 70 ¶ 26.) On or about February 27, 2001, following an evaluation by Dr. Matthew Berger, a psychiatrist, Dr. Haas was granted initial appointment to the medical staff at WVHCS. (Doc. 70 ¶¶ 43–45; Doc. 81–14 p. 16 ¶¶ 3–4.) In his application for privileges at WVHCS, Dr. Haas offered no information that he had experienced psychiatric issues in the past or that he presently had such issues at the time of application. (Doc. 70 ¶¶ 29–30.)

On May 23, 2001, Dr. Haas was performing his first unsupervised total knee replacement at the Hospital. (Doc. 70 ¶ 48.) During the course of the surgery, Dr. Haas engaged in admittedly unusual behavior. (Doc. 70 ¶¶ 49–54; Doc. 81–14 pp. 2–3 ¶¶ 48–54.) Defendant contends—and Dr. Haas agrees—that Plaintiff was having a hypomanic episode on May 23, 2001. (Doc. 57 ¶ 57 and Haas Dep. 36:18–19, March 20, 2006.) Defendant claims that Dr. Haas could not remember the names of surgical instruments and was unable to perform the surgery without assistance. (Doc. 70 ¶¶ 61–62.) Several witnesses' sworn statements support these contentions. (Davenport Dep. 11:1–22, 13:3–12, April 26, 2006; McCarty Dep. 33:25, 34:1–10; Prebish Dep. 25:22–25, 26:1–2, April 14, 2006.) Contrarily, Plaintiff asserts that he was thinking clearly and knew what he was doing, but that he was simply more jovial than usual on this day. (Doc. 81–14 p. 16 ¶ 5; Haas Dep. 36:22–23.)

Following this incident of May 23, 2001, Dr. Haas voluntarily relinquished his hospital privileges at WVHCS for health reasons. (Doc. 70 ¶ 77; Doc. 81–14 p. 18 ¶ 15.) Plaintiff met with Dr. Berger several times in the period after this incident. (Doc. 70 ¶ 81; Doc. 81–14 p. 18 ¶ 17.) On November 1, 2001, Dr. Berger issued a letter "To whom it may concern" which stated in part that "[a]s to whether Dr. Haas had a psychiatric problem, I am unable to make that determination and say whether a psychiatric problem existed. Therefore, I am unable to psychiatrically clear him." (Haas Dep. Ex. 19 p. 1.) The letter also states, however, "[that] on interview with me, the patient showed no evidence [of] any Axis I psychiatric disorder. As to Axis II issues, i.e. his personality, the patient does tend to be rather introspective and socially naive in his interactions. However, I do not believe that this reaches the threshold which could be considered a disorder and/or a disease." (Haas Ex. 19 p. 6.)

On November 6, 2001, the Credentials Committee considered Dr. Haas' request for reinstatement and issued a letter on this date stating that 'unequivocal' clearance from a psychiatrist would be required before they could recommend reinstatement. (Doc. 70 ¶ 86; Doc. 81–14 p. 19 ¶ 19.) Subsequently, Dr. Haas consulted with another psychiatrist, Dr. Kelly Felins. (Doc. 70 ¶ 87; Doc. 81–14 p. 19 ¶ 20.) Dr. Felins conducted three 45–minute sessions

---

diction of any civil action authorized by law to be commenced by any person: ... (4) To recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.... 28 U.S.C. § 1343.

on Dr. Haas, and concluded in her report dated June 26, 2002 that there was no evidence of any Axis I disorder, including bipolar disorder or schizophrenia, and that Dr. Haas was not delusional, although Dr. Felins stopped short of providing unconditional psychiatric clearance at that time. (Doc. 70 ¶ 88; Doc. 81–14 p. 19 ¶ 20.) Dr. Felins thereafter suggested that Dr. Haas see a male psychiatrist—which whom she felt he would have better progress—and recommended Dr. Dominick Mazza. (Doc. 70 ¶ 89.) Dr. Haas soon after began to meet with Dr. Mazza on a weekly basis. (Doc. 70 ¶ 90; Doc. 81–14 p. 20 ¶ 21.)

On November 4, 2002, Dr. Felins provided a report to the Credentials Committee, indicating that Dr. Haas had attended weekly psychotherapy with Dr. Mazza, and concluding that Dr. Haas' disorder was stable and in no way should interfere with his ability to return to work. (Haas Ex. 24; Doc. 70 ¶ 100; Doc. 81–14 p. 20 ¶ 21.) Dr. Felins continued in the letter to "recommend strongly that [Dr. Haas] end his voluntary medical leave and return to work without restrictions as soon as possible." *(Id.)* On November 27, 2002, Dr. Mazza wrote a letter to WVHCS confirming that Dr. Haas was a patient, and stating that he supported the evaluation made by Dr. Felins in her November 4, 2002 letter. (Haas Ex. 25; Doc. 70 ¶ 101; Doc. 81–14 p. 20 ¶ 22.) After seeking and failing to gain elaboration on these communications, Dr. Thomas Campbell, Vice-President of Medical Affairs for WVHCS, concluded that Dr. Felins' letter of November 4, 2002 constituted only a recommendation, and not a psychiatric clearance as was required to allow Dr. Haas to return to work. (Doc. 70 ¶¶ 102–07.)

On December 4, 2002, the Credentials Committee met and discussed Dr. Haas' application for reinstatement. (Doc. 70 ¶ 108; Doc. 81–14 p. 20 ¶ 26.) At this meeting, it was determined that Dr. Haas should be granted reinstatement, subject to (among others) the stipulations that he was to be accompanied during all surgical procedures by a board-certified orthopedic surgeon—whom Dr. Haas would have to obtain—for a six-month period, and that the WVHCS must receive satisfactory monthly reports from the surgeon supervising Dr. Haas. (Doc. 70 ¶ 111; Doc. 81–14 p. 21 ¶ 27.) Additionally at the December 4th meeting, Dr. Sam DePasquale, an experienced general surgeon and then Chairman of the Credentials Committee, volunteered to supervise Dr. Haas, but the Committee rejected this offer, determining that an orthopedic surgeon should be the supervisor. (Doc. 70 ¶ 110; Doc. 81–14 pp. 21–22 ¶ 29, p. 22 ¶ 30.) These stipulations were included in a letter sent to Dr. Haas dated December 18, 2002. (Haas Ex. 26; Doc. 70 ¶ 124; Doc. 81–14 pp. 23–24 ¶ 40.)

On June 24, 2003, Dr. Haas advised WVHCS via letter that he believed the stipulations set forth by the Committee pursuant to the December 18, 2002 letter were "unjustified and apparently impossible to comply with" because his efforts to find a supervising surgeon had been unsuccessful. (Haas Ex. 27; Doc. 70 ¶ 128; Doc. 81–14 p. 24 ¶ 41.) Upon learning of Dr. Haas' objections, the Credentials Committee informed him that he was out of time to appeal the stipulations. (Haas Ex. 27; Doc. 70 ¶ 131; Doc. 81–14 p. 24 ¶ 42.) Defendant admits that no such monitoring requirement had ever been imposed on a surgeon at WVHCS upon returning from a leave of absence, whether that leave was taken to recover from drug or alcohol abuse or illnesses such as heart disease or neurological disorders. (Doc. 81–14 p. 25 ¶¶ 43, 45, 47, 51.) Defendants contend, however, that since 1998 no other physician that had relinquished his or her privileges at WVHCS demonstrated behavior like that of Dr. Haas, which called directly into question their mental stability or their

ability to safely complete a surgical procedure without supervision. (Doc. 70 ¶ 165.)

On January 27, 2004, Dr. Haas was committed to a hospital for psychiatric treatment and remained there until being discharged on February 9, 2004. (Haas Dep. 189:12–25, 190:1–2, 192:20–25.) In March of 2004, Dr. Haas applied for hospital privileges in the state of Minnesota, and was granted temporary permission to practice orthopedic medicine in May of that year, with the requirement that he be monitored while in the operating room by another orthopedic surgeon. (Haas Dep. 15:20–21; 202:20–25; Doc. 70 ¶¶ 147, 148.) Dr. Haas admits that there was no difference between this restriction and that imposed on him by WVHCS to have a board-certified orthopedic surgeon in the operating room at all times with him. (Haas Dep. 179:8–18.) There is no evidence suggesting that Dr. Haas has not continued in his employment as a surgeon with two Minnesota hospitals until the present day.

On November 3, 2003, Plaintiff filed a Complaint against Defendant, alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 1201 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794. (Doc. 1.) On August 16, 2006, Defendant filed the present Motion for Summary Judgment. (Doc. 66–1.) Defendant also filed a number of exhibits in support of its motion, which have since been sealed by the Court. (Docs. 68–73.) In response, Plaintiff filed a Reply Brief (Doc. 83) and a Response to Defendant's Statement of Undisputed Material Facts (Doc. 81–14). Both of these documents have also been sealed.

This motion for summary judgment is fully briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, to-gether with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *See id.* at 248, 106 S.Ct. 2505. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988). Once the moving party has satisfied its initial burden, the

burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *See Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

## DISCUSSION

Plaintiff's Complaint (Doc. 1) alleges violations by Defendant of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 1201 *et seq.,* and the Rehabilitation Act of 1973, 29 U.S.C. §§ 791 and 794, claiming that they discriminated against Plaintiff based on his known disability. Under both causes of action Plaintiff asks the Court to take the following actions: (1) declare that the practices in which Defendant has engaged are discriminatory and in violation of the relevant statutes; (2) permanently enjoin Defendant from discriminating against similarly situated physicians on the basis of disability with regard to hospital staff privileges; (3) order immediate reinstatement of Plaintiff's hospital staff privileges, or in the alternative issue a monetary award to Plaintiff representing lost earnings and appropriate interest; (4) order that Defendant pay compensatory damages to Plaintiff; (5) order that Defendant pay punitive damages to Plaintiff; (6) order that Defendant pay Plaintiff's reasonable attorneys' fees and costs; and (7) retain jurisdiction over this action to ensure Defendant's full compliance with the above-mentioned statutes.

Defendant has moved for summary judgment on both of Plaintiff's causes of action. (Doc. 66–1.) For the reasons set forth below, Defendant's motion will be denied.

## I. Applicable Standard to Prove Liability under Title III of the ADA

To prevail on a claim under Title III of the ADA, plaintiff must prove that: (1) he has a disability within the meaning of the ADA; (2) he was discriminated against by defendant on the basis of that disability; (3) he was thereby denied goods or services; and (4) the defendant owns, leases (or leases to), or operates a place of public accommodation. *Douris v. Dougherty,* 192 F.Supp.2d 358, 368 (E.D.Pa.2002); *Bowers v. NCAA,* 118 F.Supp.2d 494, 518 (D.N.J. 2000); *Little v. Lycoming County,* 912 F.Supp. 809, 818 (M.D.Pa.1996); *Sharrow v. Bailey,* 910 F.Supp. 187, 191 (M.D.Pa. 1995). Defendant does not dispute—for purposes of summary judgment only—that Plaintiff satisfies the first, third, and fourth prongs of this analysis. Defendant denies only the second prong, that Plaintiff was discriminated against on the basis of his known mental disability. Nevertheless, the Court will briefly examine the conceded prongs of the inquiry.

### A. A Hospital Qualifies as a Place of Public Accommodation under Title III of the ADA

Considering the last of these four requirements first, the Court finds that Wilkes–Barre General Hospital ("the Hospital") qualifies as a "place of public accommodation" as that term is defined in Title III of the ADA.

A "place of public accommodation" is defined in 42 U.S.C. § 12181(7)(F) and specifically includes a hospital, provided it affects interstate commerce. In the case of *Menkowitz v. Pottstown Mem'l Med.*

*Ctr.*, 154 F.3d 113, 121 (1998), the Third Circuit Court of Appeals ruled that Title III of the ADA allowed a medical doctor with staff privileges at a hospital to assert a cause of action as an individual who was denied the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" when his staff privileges at the hospital were suspended. 42 U.S.C. § 12182(a). Additionally, and as stated above, Defendant does not contest that the Hospital is a "place of public accommodation" as that term is defined in the ADA. (Doc. 71 p. 6.)

Therefore, Plaintiff has satisfied this fourth prong of the inquiry.

### B. Dr. Haas has a Disability as Defined by Title III of the ADA

The Court finds that Plaintiff has a disability as that term is defined in the text of the ADA.[3] Dr. Haas' mental condition could fairly be considered a substantial limitation on his ability to work in his profession as a surgeon, because no remedial measures (*i.e.* medication) could be taken to correct this disability. *See Sutton*, 527 U.S. at 482–83, 119 S.Ct. 2139 (1999) (holding that where a person's physical or mental impairment is corrected by medication or other measures, they do not qualify as having an impairment that presently "substantially limits" a major life activity, such as working, and that therefore they are not disabled as that term is defined in the ADA). Further, Defendant also concedes in their memorandum of law in support of the present motion for summary judgment that Plaintiff has satisfied this first prong of the analysis. (Doc. 71 p. 6.)

### C. Plaintiff was Denied Access to Goods or Services as a Result of His Disability

The third prong of the test asks whether a plaintiff was denied goods or services as a result of his or her disability. Defendant does not contest that Plaintiff was denied "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of the [Hospital]" when his staff privileges were suspended following the events of May 23, 2001, nor do they contest that this suspension of privileges was as a result of Dr. Haas' disability. (Doc. 71 p. 6.) Accordingly, the Court finds that this prong of the analysis has also been met.

### D. Was Dr. Haas Discriminated Against by Defendant on the Basis of His Mental Disability?

Defendant argues, *inter alia*, in its memorandum of law in support of its motion for summary judgment (Doc. 71) that Plaintiff was not discriminated against on the basis of his disability because Plaintiff's condition presented a "direct threat" to Hospital patients and that the modifications required to eliminate this direct threat would fundamentally alter the nature of the Hospital's goods and services.

The ADA defines discrimination, in pertinent part, to include:

[T]he imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability ... from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be neces-

---

**3.** 42 U.S.C. § 12102(2) defines a "disability," with respect to an individual, to mean "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." The inability to work in a broad class or range of jobs as compared to the average person having comparable training, skills, and abilities may be considered a substantial limitation on the major life activity of working. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

sary for the provision of the goods, services, facilities, privileges, advantages, or accommodations. . . .

42 U.S.C. § 12182(b)(2)(A)(i).

Thus, Title III of the ADA requires a place of public accommodation to make reasonable modifications to its policies, practices, and procedures where necessary to ensure full and equal access to its services by disabled individuals. 42 U.S.C. 12182(b)(2)(A)(ii). However, the "reasonable modifications" requirement is subject to the following limitations: First, modifications are not required where they would "fundamentally alter" the nature of the public accommodation's goods and services. *Id.* Second, modifications are not required if the entity can demonstrate that taking such steps would result in an "undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). Third, modifications are not required if doing so would pose a "direct threat to the health and safety of others." 42 U.S.C. § 12182(b)(3). *Beale v. Aardvark Day Care Ctr.*, No. 00–CV413, 2000 WL 33119418, at *5 (E.D.Pa. Dec. 29, 2000).

The Court will consider the limitations of "direct threat" and "fundamental alteration of goods and services" in determining whether Defendant's actions in suspending Dr. Haas' hospital privileges and conditioning his reinstatement on the proposed stipulations amounted to unlawful discrimination under the ADA and the Rehabilitation Act.

### i. 'Direct Threat'

After reviewing the record, the Court finds that there is a genuine issue of fact as to whether Dr. Haas' mental disability posed a significant risk to the health and safety of his potential surgical patients. The reasonableness of Defendant's actions in imposing the stipulations on Plaintiff for his return to work is also a material issue of fact to be decided at trial. Accordingly, summary judgment is inappropriate.

Recognizing that the goal of ending disability discrimination must be balanced against health and safety risks that disabilities sometimes pose to others, the ADA contains a "direct threat" exception, which allows discrimination if a disability "poses a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3).[4] This section states:

Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others. The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

42 U.S.C. § 12182(b)(3).

In short, a direct threat exists when there is a *significant* risk to the health or safety of others that cannot be eliminated or reduced by reasonable accommodation. 42 U.S.C. § 12111(3); 29 C.F.R. § 1630.2(r) (emphasis added). The EEOC definition continues, in section 1630.2(r), to state that:

[A] determination that an individual poses a "direct threat" shall be based on

---

**4.** The direct threat exception is a judicially-created doctrine first announced in *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 287 n. 16, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Following that case, Congress amended several disability discrimination statutes, including the ADA and the Rehabili-

tation Act of 1973, to include the Supreme Court's direct threat language. *See* 29 U.S.C. § 706(8)(D) (excluding individuals who "would constitute a direct threat to the health or safety of other individuals"). *See also Bragdon v. Abbott*, 524 U.S. 624, 649, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. 29 C.F.R. § 1630.2(r). These factors were originally delineated in *Arline,* 480 U.S. at 288, 107 S.Ct. 1123.

As the United States Supreme Court has stated, in cases where the direct threat exception has been offered as a defense the exception can only be invoked where a risk is significant: "[b]ecause few, if any, activities in life are risk free ... the ADA do[es] not ask whether a risk exists, but whether it is significant." *Bragdon,* 524 U.S. at 649, 118 S.Ct. 2196. The existence or nonexistence of a significant risk must be determined from the standpoint of a person who refuses treatment or accommodation, and risk assessment must be based on medical or other objective evidence, applying the four factors delineated in *Arline.* The Court will thus consider the *Arline* factors to determine if a genuine issue of fact exists as to the significance of the risk posed by Dr. Haas.

Considering the second factor initially, the Court finds that the nature and severity of the potential harm to WVHCS patients was serious bodily harm, or death, resulting from Dr. Haas having another hypomanic episode in the OR that impaired his ability to complete a surgical procedure on a patient.

As to duration of the risk, that could be for Dr. Haas' entire life. There is evidence in the record to suggest that Dr. Haas had suffered from hypomanic episodes in the past, and there is no evidence to suggest the potential for such episodes is not extant.

As to the likelihood of this harm occurring, Dr. Felins—one of Dr. Haas' treating psychiatrists—advised WVHCS that people with Schizotypal Personality Disorder, such as Dr. Haas, are at a higher risk than the general population of becoming psychotic under severe stress. (Doc. 70 ¶ 97.) While this statement provides no assistance in terms of establishing a statistical probability of recurrence, it is safe to conclude that the likelihood of Dr. Haas suffering from a future hypomanic episode during a surgical procedure is greater than that for surgeons who do not have a mental disability of the type possessed by Plaintiff.

The final and perhaps most difficult factor to quantify was the imminency of the potential harm in allowing Dr. Haas to perform surgeries unattended in light of his mental disability. As previously noted, the probability of a hypomanic episode recurring is difficult to measure. Additionally, if Dr. Haas did begin to suffer a hypomanic episode during a future surgical procedure, reasonable minds can differ on (1) whether Dr. Haas would recognize himself that it was occurring at that time (something he has apparently been unable to do in the past) and/or (2) if the surgical support staff (*i.e.,* the anesthesiologist, nurses, etc.) would recognize Dr. Haas' altered mental state and be able to take appropriate measures to promptly find a qualified surgeon to complete the procedure.

At the summary judgment stage, all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party (here, WVHCS), and the entire record must be examined in

the light most favorable to Plaintiff. In light of that standard, the Court finds that there is a genuine issue of fact as to whether the risk posed by Dr. Haas to the health and safety of his patients was a *significant* one in comparison to the level of risk posed by the average orthopedic surgeon, possessing similar skills and training, that does not have the same condition as Dr. Haas. Dr. Felins' report to the Credentials Committee concluded that Dr. Haas' disorder was stable and in no way should have interfered with his ability to return to work (Haas Ex. 24), and this opinion was seconded, however tacitly, by Dr. Mazza. These two psychiatric opinions constitute a reasonable medical judgment and are sufficient to create a triable issue of fact on whether the risk posed by Dr. Haas in allowing him to perform surgeries unattended was a significant one.[5] Accordingly, summary judgment is inappropriate.

### ii. 'Fundamental Alteration of Goods and Services'

Defendant moves for summary judgment, claiming that removal of the stipu-

lations placed on Dr. Haas would have fundamentally altered the nature of the services provided by the Hospital.[6] Since surgeons working out of the Hospital are not employees thereof, WVHCS could not require any of its independent staff to supervise Dr. Haas' surgical procedures. Thus, Defendant argues, if they were required to hire or pay for a surgeon to supervise each of Plaintiff's surgeries, the nature of the services it provides would have been fundamentally altered.

To prevail on their summary judgment motion, Defendant must show that they were entitled, as a matter of law, to require that Dr. Haas adhere to the stipulations placed on his grant of reinstatement. Defendant clearly had a right—and a duty—to ensure that all physicians working at the Hospital performed their duties safely and skillfully. Certainly, a doctor who is significantly prone to hypomanic episodes poses a direct threat to those patients whom he or she treats; this may be especially true of an orthopedic surgeon, on whom a large degree of pressure

---

**5.** Defendant cites the case of *Judice v. Hospital Serv. Dist. No. 1,* 919 F.Supp. 978 (E.D.La. 1996) (holding that hospital defendant did not violate ADA by requiring neurosurgeon who suffered from alcoholism—and who had previously relapsed and denied addiction when confronted—to undergo second specialized medical evaluation before reinstating hospital privileges) in support of their motion for summary judgment. While somewhat analogous to the present action, even if *Judice* represented the prevailing jurisprudence in this Circuit, the record here indicates that two separate psychiatrists did support Dr. Haas' return to work without restrictions. Thus, *Judice's* suggestion that a hospital be allowed a 'second opinion' before reinstating a surgeon who suffers from a mental disability is arguably satisfied here.

**6.** The Credentials Committee placed the following stipulations on their recommendation to reinstate Dr. Haas' surgical privileges at the Hospital:

(a) Dr. Haas' surgical procedures in the operating room had to be monitored by a Board–Certified orthopedic surgeon, who is a member of the Medical Staff of WVHCS, and the surgeon must accompany him in the operating room at all times;

(b) Dr. Haas was responsible for obtaining the Board–Certified supervising surgeon;

(c) WVHCS' Physicians' Health Committee had to receive satisfactory quarterly reports from Dr. Haas' treating physician;

(d) WVHCS Physicians' Health Committee had to receive satisfactory monthly reports from Dr. Haas' supervising surgeon for a period of six (6) months, after which time the Credentials Committee would consider the supervising surgeon's recommendation and make a re-determination upon Dr. Haas' surgical privileges; and

(e) Dr. Haas had to meet the criteria for Active Staff membership as outlined in the Medical Staff Bylas.

is placed to perform complicated procedures in a short window of time.

Nevertheless, the Court finds that a genuine issue of fact exists as to the reasonableness of the accommodations offered by Defendant. Though interesting that Dr. Haas later accepted similar stipulations on his surgical privileges at two Minnesota hospitals, at the summary judgment stage the entire record must be examined in the light most favorable to the nonmoving party, here being the Plaintiff. It is reasonable to assume that Dr. Haas accepted comparable stipulations at the Minnesota hospitals because he was eager to earn a paycheck, and not because he had at that point come to the realization that those stipulations were necessary or lawful. It is not the Court's task to decide at this stage whether Defendant's proposed accommodations—the stipulations placed on his reinstatement—were objectively reasonable. It is only for the Court to determine if a genuine issue of fact exists as to that determination, and we must resolve that doubt against the moving party, i.e., the Defendant. In light of the entire record in this case, the Court finds that a genuine issue of fact exists as to whether Defendant's accommodations were reasonable.

For the above stated reasons, Defendant's motion for summary judgment as to Plaintiff's claim under the ADA will be denied.

## II. Plaintiff's Cause of Action under the Rehabilitation Act of 1973

Plaintiff has also alleged that Defendant has violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibits discrimination on the basis of disability by a program receiving federal assistance.[7] Defendant has moved for summary judgment on this claim. For the reasons stated below, Defendant's motion for summary judgment as to Plaintiff's cause of action under the Rehabilitation Act will be denied.

In order to establish a claim under the Rehabilitation Act, plaintiff must show that: (1) he is a "handicapped individual" under the Act[8]; (2) he is "otherwise qualified" for participation in the program or activity, or for the position sought; (3) he was excluded from the position sought, denied the benefits of, or subjected to discrimination under the program or activity "solely by reason of his [or her] handicap;" and (4) the relevant program or activity receives federal financial assistance. Menkowitz, 154 F.3d at 123; Wagner v. Fair Acres Geriatric Ctr., 49 F.3d 1002, 1009 (3d Cir.1995); Nathanson v. Med. Coll. of Pa., 926 F.2d 1368, 1380 (3d Cir. 1991). In the employment context, "whether suit is filed under the Rehabilitation Act or under [the ADA], the substantive standards for determining liability are the same." McDonald v. Pa., 62 F.3d 92, 95 (3d Cir.1995).

Defendant receives federal funds under Medicare and Medicaid programs. Further, it is undisputed that Defendant's actions in suspending Dr. Haas' surgical privileges at the Hospital were motivated by the fact that Dr. Haas suffers from a mental disability. Defendant contends, however, that Plaintiff is not "otherwise

---

7. Section 504 of the Rehabilitation Act provides, in part:

   No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
   29 U.S.C. § 794(a).

8. The definition of "individual with a disability" under the Rehabilitation Act is the same as that under the ADA. See 29 U.S.C. § 705(20)(B).

qualified" for surgical privileges at WVHCS. The concept of "direct threat" under the Rehabilitation Act is the same as under the ADA.[9] Therefore, Defendant's direct threat defense under the ADA, discussed above, applies equally here to Plaintiff's claim under the Rehabilitation Act. The same triable issue of fact exists, however, in the direct threat analysis under the Rehabilitation Act as exists with respect to the ADA claim. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim under the Rehabilitation Act will likewise be denied.

## CONCLUSION

After reviewing all pertinent evidence from the record, the Court is of the opinion that genuine issues of fact exist as to material issues present in this case. Accordingly, Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 will be denied.

An appropriate Order will follow.

## *ORDER*

**NOW,** this *6th* day of December, 2006, **IT IS HEREBY ORDERED** that Defendant Wyoming Valley Health Care System's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 is **DENIED.**

---

9. *See* 28 C.F.R. Pt. 36, App. B (explaining that the direct threat exception, which was later codified in Title III of the ADA, was adopted from the Supreme Court's holding in *Arline,* 480 U.S. at 287, 107 S.Ct. 1123). In *Arline,* the Supreme Court reconciled contrary objectives—of prohibiting discrimination against individuals with disabilities while protecting others from significant health and safety risks posed by those individuals—by construing the Rehabilitation Act not to require the hiring of a person who posed "a significant risk of communicating an infectious disease to others." *Id.* at 287, n. 16, 107 S.Ct. 1123. *Bragdon,* 524 U.S. at 649, 118 S.Ct. 2196.